# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

IN RE:                         )

)      Case No. 22-80871-CRJ7

INTEGRITY FAMILY CARE NORTH    )

ALABAMA LLC,            )      Chapter 7

)

Debtor.               )

)

## MOTION FOR DECLARATORY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR RELIEF FROM THE AUTOMATIC STAY

COMES NOW, through undersigned counsel, CPI/AHP Huntsville Madison MOB Owner, L.L.C. ("**Movant**") as creditor and party-in-interest in the above-styled bankruptcy case, and also as landlord to Integrity Family Care North Alabama, LLC ("**Debtor**") under a certain lease agreement, and hereby respectfully requests that this Honorable Court enter an Order either: 1) declaring that a certain lease agreement whereby Debtor was the tenant thereunder is excluded from Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(b)(2) because Landlord terminated the lease prior to Debtor's filing this bankruptcy action, or, in the alternative 2) grant Movant's Motion for Relief from the Automatic Stay (the "**Motion**") so that Movant may proceed with prosecuting its unlawful detainer action against Debtor. In support of this Motion, Movant states as follows:

## JURISDICTION

1. This Honorable Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).

2. Venue of this matter is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document     Page 1 of 74

3.      On September 26, 2016, Debtor entered a certain commercial lease with Madison Medical I, LLC to lease medical offices commonly known as 1041 Balch Road, Suite 300, Madison, AL 35758 (the "**Leased Premises**"), which lease Movant subsequently assumed (the "**Lease**"). The Lease is attached hereto as Exhibit A.

4.      During the Lease term, Debtor breached and defaulted on its Lease obligations by, among other items, failing to pay all rents and monies due and owing to Movant.

5.      On April 8, 2022, Movant delivered a "notice to quit" letter (the "**Quit Letter**") to Debtor which, among other things, terminated the Lease pursuant to the terms of the Lease. The Quit Letter is attached hereto as Exhibit B.

6.      Subsequently, on May 5, 2022, after Debtor failed to surrender possession of the Leased Premises to Movant, Movant filed an unlawful detainer action against Debtor in the District Court of Madison County, Alabama, case number 47-DV-2022-900871.00 (the "**District Court Case**").

7.      On May 20, 2022, Debtor filed the above-styled action in this Honorable Court. On May 24, 2022, Debtor filed a "Suggestion of Bankruptcy" in the District Court Case. A copy of the Suggestion of Bankruptcy is attached hereto as Exhibit C.

8.      Due to the automatic stay (the "**Stay**"), the District Court Case was stayed, and Movant has been unable to prosecute its unlawful detainer action to recover possession of its Leased Premises.

9.      Upon information and belief, Debtor ceased its business operations at the Leased Premises sometime in May 2022 and has not been earning any income because of any operations occurring on Leased Premises. Additionally, upon information and belief, Debtor left equipment, furniture, and files (including patient and medical files) in the Leased Premises.

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 2 of 74

10.     Notwithstanding the foregoing, Debtor has not surrendered possession of the Leased Premises to Movant.

## ARGUMENT

11.     Movant is entitled to a declaratory judgment that the Lease is excluded from Debtor's bankruptcy estate because the Lease was terminated prior to the filing of this bankruptcy action.  Alternatively, if this Honorable Court does not determine the Lease is excluded from Debtor's bankruptcy estate, Movant is entitled to relief from the Stay to prosecute the District Court Case so that possession of the Leased Premises may be restored to Movant.

12.     "A lease of nonresidential real property that has terminated prior to the bankruptcy's filing is excluded from the debtor's estate under 11 U.S.C. § 541(b)(2). Because the debtor has no interest in a validly terminated lease, the automatic stay does not preclude a lessor from taking possession of property leased to a debtor under a terminated nonresidential real property lease. 11 U.S.C. § 362(b)(10). Accordingly, it is not necessary for the lessor to move for relief from stay in order to regain possession of nonresidential real property held by a debtor under a terminated lease." In re Foote, 277 B.R. 393, 396 (Bankr. E.D. Ark. 2002) (internal citations and quotations omitted).  Whether a lease has terminated is a question of state law. In re Foote, 277 B.R. 393, 396 (Bankr. E.D. Ark. 2002).

13.     In Foote, the debtor became delinquent in rent payments and the landlord, "served [d]ebtor with a Notice to Quit and Demand for Possession on September 24, 2001 that informed [d]ebtor of the Sublease's termination and requested the [d]ebtor to vacate the premises" Id.

14.     The Foote debtor failed to vacate the premises, and the landlord brought an unlawful detainer action. Id.  The parties then came to an agreement such that "[the landlord] agreed to forbear from executing a writ of possession and taking possession of the Premises." Id.

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document      Page 3 of 74

The Foote debtor then breached that agreement by failing to pay as agreed. Id. at 395–96. While the Foote parties "dispute whether a writ possession was properly served on [d]ebtor," the Foote debtor filed for bankruptcy on the same date that the local Sheriff scheduled the Foote debtor's eviction. Id. at 396.

15.     The Foote landlord sought relief from the automatic stay so that it could proceed with its unlawful detainer action. The court ultimately determined that the subject sublease had been terminated prior to the bankruptcy filing and, thus, was excluded from the Foote debtor's bankruptcy estate under 11 U.S.C. § 541(b)(2).

16.     In the present matter, like in Foote, Movant lawfully terminated the Lease prior to Debtor filing this action, and as such, Debtor has no continuing leasehold interest in the Leased Premises. Accordingly, the Lease should be excluded from the Debtor's bankruptcy estate. Movant requests a declaratory judgment that the Lease is excluded from Debtor's bankruptcy estate so that the District Court Case may proceed with the unlawful detainer action.

17.     As an alternative remedy, to the extent this Honorable Court would determine the Lease is not excluded from Debtor's bankruptcy estate, under §362(d)(1) of the Bankruptcy Code, "the court shall grant relief from the stay . . . for cause." 11 U.S.C. § 362(d)(1). Accordingly, "[w]hether cause exists to grant stay relief must be determined on a case-by-case basis based upon the totality of the circumstances in each particular case." In re Mack, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006). Moreover, "[c]ause, for either dismissal [under 11 U.S.C. § 1112(b)] or relief from the stay [under 11 U.S.C. § 362 (d)(1)], may be found based on unenumerated factors." In re Balco Equities Ltd., Inc., 312 B.R. 734, 748–49 (Bankr. S.D.N.Y 2004) (internal citations and quotations omitted).

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document    Page 4 of 74

18. Under the Bankruptcy Code, adequate cause exists for this Honorable Court to grant Movant's Motion so that Movant may prosecute the District Court Case in order to restore possession of the Leased Premises to Movant. Adequate cause can be found in the fact that Movant is in the business and trade of being a landlord to tenants in commercial offices, and Movant has been, and continues to be, deprived of business operations at the Leased Premises, which has caused, and continues to cause, financial harm to Movant. The Leased Premises remains empty, unleased, and unable to be placed in the stream of commerce until permitted by this Honorable Court, under the Bankruptcy Code, and by the District Court having jurisdiction over the District Court Case. Moreover, as described above, since the Lease at issue was terminated, Debtor has no interest or equity in the Leased Premises at issue. Accordingly, under 11 U.S.C. § 362(d)(2)(A)&(B), when "the debtor does not have any equity in such property; and such property is not necessary to an effective reorganization," Movant is entitled to relief from the Stay.

## CONCLUSION

WHEREFORE, in consideration of the foregoing, Movant respectfully requests that this Honorable Court enter an Order either 1) declaring that the Lease is excluded from Debtor's bankruptcy estate, or, in the alternative, 2) granting Movant's Motion for Relief from the Automatic Stay.

Respectfully submitted this 11th day of July 2022,

/s/ Kyle A. Scholl
**KYLE A. SCHOLL (SCH158)**
**BRIAN J. RICHARDSON (RIC080)**
*Attorneys for Integrity Family Care North Alabama, LLC*

OF COUNSEL:
Kyle A. Scholl
Brian J. Richardson
LEO LAW FIRM, LLC

200 Randolph Ave.
Huntsville, AL 35801
kscholl@leo-law.com
P: (256) 539-6000

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July, 2022, I electronically filed the foregoing with the Clerk of this Honorable Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kyle A. Scholl*
**KYLE A. SCHOLL (SCH158)**
**BRIAN J. RICHARDSON (RIC080)**
*Attorneys for Integrity Family Care North Alabama, LLC*

## **Exhibit A**

*(see attached)*

## LEASE AGREEMENT
### (Triple Net)

**THIS LEASE AGREEMENT** (this "Lease") is dated this 26 day of September, 2016, between **MADISON MEDICAL I, LLC** ("Landlord") and the Tenant named below.

| | |
|---|---|
| **Tenant:** | **INTEGRITY FAMILY CARE NORTH ALABAMA, LLC** |
| **Tenant's Representative:** | *Jason Lockette / John Brooks* |
| **Address and Phone No.:** | *lockettejp@gmail.com / john.brooks@coldwellbanker.com* |

**Premises:** That portion of the Building, located on the third floor and designated as Suite 300, containing approximately 7,589 square feet of Net Rentable Area (as defined in the Work Agreement attached hereto), subject to adjustment as provided in Paragraph 2 herein, as shown on **Exhibit A**, situated on a portion of that certain real property legally described in **Exhibit A-1** attached hereto.

**Building:** Medical Office Building located at 1041 Balch Road, Madison, AL 35758 and containing approximately sixty thousand (60,000) rentable square feet.

**Tenant's Proportionate Share of Building:** 12.65% (subject to reapportionment based on the final Net Rentable Area of the Premises as provided in Paragraph 2)

**Property:** The real property upon which the Building is located.

**Lease Term:** A period commencing on the Commencement Date and expiring on the date which is one hundred thirty two (132) months after the Commencement Date (the "Lease Term").

**Renewal Term:** One (1) option to renew the Lease Term for five (5) additional years in accordance with Paragraph 38, herein.

**Commencement Date:** The earlier of (i) the date Tenant occupies the Premises, or (ii) the date a certificate of occupancy or notification of completion is issued for the Premises, as provided herein.

**Rent Commencement Date:** The Commencement Date.

**Initial Base Rent:** $21.45 per square foot of Net Rentable Area for the first Lease Year, or $13,565.34 per month, and $21.88 per square foot of Net Rentable Area for the second Lease Year, or $13836.64 per month (subject to adjustment as provided in Paragraph 2). Commencing with the third Lease Year Base Rent shall escalate annually as provided below

**Base Rent Escalator:** Two percent (2.0%) per year, on each anniversary of the Commencement Date.

{H0291141.2}

| | |
|---|---|
| **Initial Estimated Monthly Operating Expense Payments:** (estimates only and subject to adjustment to actual costs and expenses according to the provisions of this Lease) | $ 5.65 per square foot of Net Rentable Area |
| **Initial Monthly Base Rent and Operating Expense Payments:** | $17,138.49 for the first Lease Year, and $17,409.79 for the second Lease Year (subject to adjustment as provided in Paragraph 2) |
| **Security Deposit:** | N/A |
| **Tenant Improvement Allowance:** | $75.00 per square foot of Net Rentable Area |
| **Guarantors:** | Dr. Jason Lockette and Mr. Jonathan Osborne |
| **Landlord Broker:** | Triad Properties Corporation |
| **Tenant Broker:** | Coldwell Banker of the Valley |
| **Addenda:** | Exhibit A (Premises)<br>Exhibit A-1 (Legal Description of Real Property)<br>Exhibit B (Work Agreement)<br>Exhibit C (Lease Guaranty)<br>Exhibit D (Rules and Regulations) |

1.    **Granting Clause.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.

2.    **Acceptance of Premises.** Landlord, at Tenant's expense, subject to the Tenant Improvement Allowance (defined in the Work Agreement) shall construct the Premises in accordance with the Work Agreement attached hereto as Exhibit B, which requires the Landlord to construct and complete the Tenant Improvements in accordance with the Plans and Specifications (defined in the Work Agreement). Except as may otherwise be expressly provided in this Lease, including the Work Agreement attached hereto, Tenant shall accept the Premises on the Commencement Date in its "AS-IS" condition, subject to all applicable laws, ordinances, regulations, covenants and restrictions, and Landlord shall have no obligation to perform or pay for any repair or other work therein. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. Except as provided in Paragraph 10, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken except for items that are Landlord's responsibility under Paragraph 10 and any punch-list items agreed to in writing by Landlord and Tenant. The execution of this Lease shall constitute execution of the Work Agreement attached hereto and made a part hereof by Tenant and Landlord. Notwithstanding anything to the contrary contained herein, the final Net Rentable Area of the Premises shall be determined by the final Plans and

Specifications as provided in the Work Agreement, and this Lease shall be automatically amended to reflect the final Net Rentable Area of the Premises as provided in said Plans and Specifications. If requested by either party, the parties hereto shall enter into a written confirmation letter which reflects the final Net Rentable Area of the Premises and corresponding monthly payments of Base Rent and Operating Expenses, and Tenant's Proportionate Share.

      3.     **Use**.

          (a)     Subject to Tenant's compliance with all zoning ordinances and Legal Requirements (as hereinafter defined), the Premises shall be used only for general office or medical office uses and for such other lawful purposes as may be incidental thereto; however, no retail sales may be made from the Premises. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any tenants of the Building. Outside storage, including without limitation, storage of trucks and other vehicles, is prohibited without Landlord's prior written consent.

          (b)     Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and any use or other restrictions now or hereafter applicable to the Premises (collectively, "<u>Legal Requirements</u>"). The Premises shall not be used as a place of public accommodation under the Americans With Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time. After the Commencement Date, Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's specific use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, increase the insurance risk, or cause the disallowance of any sprinkler credits. If any increase in the cost of any insurance on the Premises or the Building is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord. Any entrance into or occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease.

          (c)     Tenant and its employees and invitees shall have the non-exclusive right to use, in common with others, any areas designated by Landlord from time to time as common areas for the use and enjoyment of all tenants and occupants of the Building, subject to such reasonable Rules and Regulations as Landlord may promulgate from time to time, including those attached hereto as <u>Exhibit C</u>.

      4.     **Base Rent**. Tenant shall pay Base Rent in the amount set forth on the first page of this Lease for the first and second Lease Year. Commencing with the third Lease Year, Base Rent shall increase by two percent (2.0%) each year. As used herein, a "Lease Year" shall mean each twelve (12) month period commencing on the Commencement Date and each anniversary thereof. Base Rent shall accrue from and after the Rent Commencement Date. Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month succeeding the Rent Commencement Date. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except where expressly provided in this Lease. Tenant acknowledges that late

Case 22-80871-CRJ7   Doc 10   Filed 07/11/22   Entered 07/11/22 16:24:34   Desc Main
Document    Page 10 of 74

payment by Tenant to Landlord of any rent due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to determine. Therefore, if Tenant is delinquent in any monthly installment of Base Rent, estimated Operating Expenses, or other sums due and payable hereunder for more than five (5) days, Tenant shall pay to Landlord, on demand, a late charge equal to five percent (5%) of such delinquent sum, in addition to any other remedies available to Landlord under the terms of this Lease. The parties agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of such late payment by Tenant. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

5.  **Intentionally deleted**.

6.  **Operating Expense Payments**.

(a)     During each month of the Lease Term, commencing on the Rent Commencement Date, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord at the beginning of each Lease year throughout the Lease Term, of Tenant's Proportionate Share (hereinafter defined) of Operating Expenses for the Building and the Property, including Taxes (hereinafter defined), Utilities (hereinafter defined) and Insurance (hereinafter defined). Payments thereof for any fractional calendar month shall be prorated.

(b)     Landlord and Tenant agree that Tenant will be responsible for all Taxes, Utilities, maintenance, Insurance and other costs and expenses associated with the upkeep and operation of the Premises. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Building or the Property, including but not limited to costs of: Utilities; maintenance, repair and replacement of all portions of the Building or the Property, including without limitation the Building's roof, foundation, structural members, paving and parking areas, roads, alleys and driveways; mowing, snow removal, landscaping, and exterior painting; window washing; the cost of maintaining utility lines, fire sprinklers and fire protection systems, exterior lighting and mechanical, plumbing and building systems serving the Building; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association to which the Building or the Property is subject; fees payable to tax consultants and attorneys for consultation and contesting taxes; environmental insurance or environmental management fees; the cost of any insurance deductibles for insurance required to be maintained by Landlord hereunder; property management fees payable to a property manager, including any affiliate of Landlord; security services, if any; trash collection, sweeping and removal; common area janitorial services; additions or alterations made by Landlord to the Building in order to comply with Legal Requirements (other than those expressly required herein to be made by Tenant) or that are appropriate to the continued operation of the Building or the Property; provided, however, that if the cost of any such additions or alterations are required to be capitalized for federal income tax purposes, then the cost thereof shall be amortized on a straight line basis over a period equal to the lesser of the useful life thereof for federal income tax purposes or ten (10) years and included in Operating Expenses only to the extent of the amortized amount for the respective calendar year; and costs, expenses, depreciation or amortization for capital repairs and capital replacements made by Landlord, provided that the cost of any repairs or replacements which are classified as capital improvements under generally accepted accounting principles shall be amortized with interest over the lesser of the useful life of the improvement or ten (10) years and included in Operating Expenses only to the extent of the amortized amount for the respective calendar year. In addition, Operating Expenses shall include (i) Taxes for each calendar year during the Lease term, (ii) the cost of insurance maintained by Landlord for the Building and the Property for each calendar year during the Lease term ("Insurance"), and (iii) the cost of Utilities for the Premises for each calendar year during the Lease Term; provided, however,

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document        Page 11 of 74

that Taxes and Insurance shall be pro-rated for any partial calendar year during the Lease Term (e.g., the first and last years of the Lease Term).

        (c)      Notwithstanding the foregoing, Operating Expenses do not include (i) debt service under mortgages or ground rent under ground leases; (ii) costs of restoration to the extent of net insurance proceeds received by Landlord with respect thereto; (iii) leasing commissions or the costs of renovating space for tenants; or (iv) any costs or legal fees incurred in connection with any particular tenant.

        (d)      If Tenant's total payments of Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within thirty (30) days after demand, and if more, then Landlord shall retain such excess and credit it against Tenant's next payments. For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Rent Commencement Date, and the last year, which shall end on the expiration of this Lease.

        (e)      With respect to Operating Expenses which Landlord allocates for the entire Building, Tenant's "Proportionate Share" shall be the percentage of the Net Rentable Area of the Premises to the total rentable area of the Building. The current estimate of Tenant's Proportionate Share is provided on the first page of this Lease and is subject to adjustment as provided in Paragraph 2. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Building that includes the Premises or that varies with occupancy or use. The estimated Operating Expenses for the Premises set forth on the first page of this Lease are only estimates, and Landlord makes no guaranty or warranty that such estimates will be accurate.

      7.      **Utilities**. Landlord shall pay for all Utilities relating to Tenant's occupancy and use of the Premises. As used herein, "Utilities" shall mean all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Utilities shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 6 of this Lease. At the beginning of each Lease year, Landlord shall provide Tenant an estimate of the monthly Utility cost associated with the Premises, and Tenant shall pay such amount with the Base Rent and the Monthly Operating Expense Payments, and such Utility cost shall be reconciled quarterly and reasonably adjusted based on Tenant's actual usage. Landlord may cause at Tenant's expense any utilities to be separately metered or charged directly to Tenant by the provider. Tenant shall pay its share of all charges for jointly metered utilities based on Tenant's Proportionate Share of the Building or the Property, as reasonably determined by Landlord. Tenant agrees to limit use of water and sewer for normal restroom use. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent.

      8.      **Taxes**. Subject to Tenant's obligation to reimburse Tenant's Proportionate Share, as provided in this Lease, Landlord shall pay all taxes, assessments and governmental charges (collectively referred to as "Taxes") that either (a) accrue against the Building during the Lease Term if such Taxes are payable in advance, or (b) are assessed against the Building during the Lease Term if such Taxes are payable in arrears. Taxes shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 6 hereof during each year of the Lease Term, based upon Landlord's reasonable estimate of the amount of Taxes (based on the previous year's Taxes), and shall be subject to reconciliation and adjustment pursuant to Paragraph 6 once the actual amount of Taxes is known. Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof and any costs incurred in such contest may be included as part of Taxes. All capital levies or other taxes assessed or imposed on

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document    Page 12 of 74

Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Building or any portion thereof shall be paid by Tenant to Landlord monthly in estimated installments or upon demand, at the option of Landlord, as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder. If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant, and if any such taxes are levied or assessed against Landlord or Landlord's property and (a) Landlord pays them or (b) the assessed value of Landlord's property is increased thereby and Landlord pays the increased taxes, then Tenant shall pay to Landlord such taxes within ten (10) days after Landlord's request therefor.

9. **Insurance**.

    (a)    Landlord shall maintain all risk property insurance covering the full replacement cost of the Building (excluding foundations), less a commercially reasonable deductible if Landlord so chooses. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary covering the Building, the Property and the Premises, including, but not limited to, commercial liability insurance, flood insurance, and rent loss insurance. All costs of such insurance shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 6 hereof, and Tenant shall reimburse Landlord for Tenant's Proportionate Share of all such costs. The Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Building will be determined by Landlord based upon the insurer's cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

    (b)    Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing during the Lease Term, Tenant, at its expense, shall obtain and maintain in full force the following insurance coverage: (i) all risk property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant or for Tenant's benefit; (ii) worker's compensation insurance with no less than the minimum limits required by law; (iii) employer's liability insurance with such limits as required by law; and (iv) commercial liability insurance, with a minimum limit of $1,000,000 per occurrence and a minimum umbrella limit of $2,000,000, for a total minimum combined general liability and umbrella limit of $3,000,000 (together with such additional umbrella coverage as Landlord may reasonably require) for property damage, personal injuries, or deaths of persons occurring in or about the Premises. Landlord may from time to time require reasonable increases in any such limits. The commercial liability policies shall name Landlord and Landlord's agents as additional insureds, insure on an occurrence and not a claims-made basis, be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless thirty (30) days prior written notice shall have been given to Landlord, contain a hostile fire endorsement or amended pollution endorsement, and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such certificates, or at Landlord's option, copies of the policies evidencing coverage shall be delivered to Landlord by Tenant at least ten (10) days prior to the Commencement Date and at least fifteen (15) days prior to each renewal of said insurance. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord copies of such policies and certificates evidencing the coverage required herein, Landlord, in addition to any remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of the cost.

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document       Page 13 of 74

(c)     The all risk property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against.  The failure of a party to insure its property shall not void this waiver.  Notwithstanding anything to the contrary contained herein, Tenant hereby waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder (whether by self-insurance or otherwise), regardless of whether the negligence or fault of Landlord caused such loss.  Landlord hereby waives any claims against Tenant, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder to the extent insurance proceeds are received therefor, regardless of whether the negligence or fault of Tenant caused such loss; however, Landlord's waiver shall not apply to any deductible amounts maintained by Landlord under its insurance.

10.     **Landlord's Services; Repairs**.

(a)     Provided Tenant shall not be in default under this Lease (following the giving of any applicable notice and expiration of any applicable cure period), Landlord agrees to provide to Tenant the following services:

(i)     General cleaning and janitorial service, for the common area of the Building, five (5) days per week, not including Holidays (defined herein);

(ii)    Heating and air-conditioning service ("HVAC") as typically furnished by landlord of comparable first class office buildings located in Madison County, Alabama, daily on Mondays through Fridays from 7:00 A.M. to 7:00 P.M. and on Saturdays from 7:00 A.M. to 1:00 P.M., with New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day and any other national holiday (herein collectively called the "Holidays") excepted; after hours HVAC service shall be available upon reasonable prior request at an hourly surcharge rate established by Landlord; subject to increase not more frequently that annually based upon increased utility costs to Landlord, but always at actual cost;

(iii)   At all times Landlord shall have at least one elevator servicing each of the floors;

(iv)    Electric current for lighting, replacement bulbs for common area lighting and reasonable facilities for furnishing the usual and normal electric power for office space.  Landlord shall have the right to prescribe uniform and reasonable charges for bulb replacement services.  Tenant shall not, without Landlord's prior written consent, use any equipment, including, without limitation, air-conditioning units, electronic data processing machines, punch card machines, or any other machines which use electric current in excess of 110 volts, which will increase the amount of electricity ordinarily furnished during normal business hours for the use of the Premises as office space;

(v)     Water available on each floor of the Building for drinking and lavatory use; and

(vi)    Maintenance of the Building, including the parking lot servicing the Building.

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document     Page 14 of 74

Except as specifically addressed herein, the failure by Landlord, to any extent, to furnish, or the interruption or termination of these defined services in whole or in part, resulting from any Force Majeure event (i) shall not render Landlord liable in any respect, (ii) shall not be construed as an eviction of Tenant, (iii) shall not work an abatement of Rent, or (iv) relieve Tenant from the obligation to fulfill any covenant or agreement in this Lease. Notwithstanding any provision herein to the contrary, in the event that an interruption or termination of building standard electrical service, the supply of water or HVAC service (collectively, "Essential Services"), which Landlord is specifically obligated to provide to Tenant pursuant to the terms of this Lease, and such interruption or termination continues for a period of five (5) consecutive business days (other than an interruption caused by Tenant, Tenant's agent, employees, invitees, contractors, subcontractors or licensees) and directly affects Tenant's ability to conduct its business, there shall be an abatement of Rent, as Tenant's sole and exclusive remedy, from and after the first full day following any such five (5) consecutive business days of termination or interruption, until such services are restored. Landlord shall use commercially reasonable efforts to restore such services as soon as possible. The terms of this paragraph shall have no application to casualty events and exercises of the power of eminent domain that affect the Building or the Property, which shall be governed by the applicable terms and provisions in this Lease. In the event that such services are interrupted, Tenant shall have no right to terminate this Lease. Notwithstanding anything contained in this Paragraph 10(a) to the contrary, the cost of providing the services described above shall be Operating Expenses chargeable to the Tenant pursuant to the terms of Paragraph 6 of this Lease.

(b)     This Lease is intended to be a net lease; accordingly, Landlord's maintenance and repair obligations are limited to the replacement of the Building's roof and maintenance of the foundation and structural members, reasonable wear and tear and uninsured losses and damages caused by Tenant, its agents, employees and contractors excluded, the cost of such maintenance, repair and replacement to be paid by Tenant in accordance with Paragraph 6 hereof. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, or office entries that are included in the Premises, all of which shall be maintained by Tenant. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10, after which Landlord shall have a reasonable opportunity to repair such item. Landlord shall also maintain in good repair and condition the structural members of the Building, parking areas and other common areas of the Building, including but not limited to driveways, alleys, landscape and grounds surrounding the Premises, the cost of such maintenance, repair and replacement to be paid by Tenant in accordance with Paragraph 6 hereof.

11.     **Tenant's Repairs**.

(a)     Subject to Landlord's obligation in Paragraph 10, Tenant, at its sole expense, shall repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, plumbing, water, and sewer lines up to points of common connection, entries, doors, ceilings, windows, interior walls, and the interior side of demising walls, and heating, ventilation and air conditioning systems, and other building and mechanical systems serving the Premises. Such repair and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Maintenance and repair of the heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises, shall be at Tenant's expense pursuant to maintenance service contracts entered into by Landlord (but at Tenant's expense). Notwithstanding the foregoing, Landlord shall maintain and keep in good condition those building systems that service the Building or which include more than just the Premises, including but not limited to, any elevators, HVAC systems, and fire protection systems, and all costs incurred in connection therewith, including any third party maintenance contracts, shall be included in Operating Expenses pursuant to Paragraph 6.

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document        Page 15 of 74

(b)     In the event that any repair or maintenance obligation required to be performed by Tenant hereunder may affect the structural integrity of the Building (e.g., roof, foundation, structural members), prior to commencing any such repair, Tenant shall provide Landlord with written notice of the necessary repair or maintenance and a brief summary of the structural component or components of the Building that may be affected by such repair or maintenance.  Within ten (10) business days after Landlord's receipt of Tenant's written notice, Landlord shall have the right, but not the obligation, to elect to cause such repair or maintenance to be performed by Landlord, or a contractor selected and engaged by Landlord, but at Tenant's sole cost and expense.  The foregoing sentence is not intended to obligate Tenant to pay for repairs or maintenance to those structural items which are Landlord's responsibility pursuant to Paragraph 10 above, but shall only require Tenant to pay for the repair and maintenance to such structural components to the extent such repair or maintenance is necessitated due to the performance of Tenant's repair and maintenance obligations pursuant to this Paragraph 11, or to the extent the cost of such repair or maintenance is otherwise Tenant's responsibility under Paragraph 6.

(c)     Within the fifteen (15) day period prior to the expiration or termination of this Lease, Tenant shall deliver to Landlord a certificate from an engineer reasonably acceptable to Landlord certifying that the hot water equipment and the HVAC system that services the Premises are then in good repair and working order.  If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within ten (10) days after demand therefor.  Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building that results from damage caused by Tenant, its agents, contractors, or invitees and any repair that benefits only the Premises.

12.     **Tenant-Made Alterations and Trade Fixtures**.

(a)     After completion of Tenant's Work (defined in the Work Agreement), Tenant may make non-structural or non-mechanical alterations, additions, or improvements to the Premises with Landlord's prior written consent, which shall not be unreasonably withheld.  In no event shall Tenant make any alterations, additions or improvements to the structural or mechanical systems of the Building or the Premises without Landlord's prior written consent, which may be withheld in Landlord's sole discretion.  Any alterations, additions, or improvements to the Premises which are made by or on behalf of Tenant are referred to herein as "Tenant-Made Alterations." Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations.

(b)     All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only high quality grades of materials shall be used.  All plans and specifications for any and all Tenant-Made Alterations shall be submitted to Landlord for its prior approval.  Landlord may monitor construction of the Tenant-Made Alterations.  Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction not to exceed five percent (5%) of the total cost of such Tenant-Made Alterations.  Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations.

(c)     Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law.  Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document          Page 16 of 74

other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction for the actions of all contractors or subcontractors of Tenant doing work on the Premises. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord an affidavit setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors.

(d)     Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord's requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Prior to the expiration or termination of this Lease, Tenant, at its sole expense, shall repair any and all damage caused by such removal.

(e)     Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without damage to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Prior to the expiration or termination of this Lease, Tenant, at its sole expense, shall remove its Trade Fixtures and shall repair any and all damage caused by such removal.

13.     **Signs**.  Tenant shall be allowed to place its name on any building standard Tenant directory located in the lobby of the Building. Tenant shall also be permitted, at its cost and with the prior written consent of Landlord, to place a sign adjacent to or on the entry door to the Premises, such sign to be of similar quality and consistent with other entry signs located in the Building. In addition, if available and if Landlord elects to construct an exterior monument pylon sign, with the prior written consent of Landlord in its sole discretion, Tenant may at its sole cost, add its name to such pylon sign. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's prior written approval and shall conform in all respects to Landlord's requirements. Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Tenant shall have no right to install any signage on the Building without the Landlord's prior written consent in its sole discretion. Landlord shall not be required to notify Tenant of whether it consents to any sign until it (a) has received detailed, to-scale drawings thereof specifying design, material composition, color scheme, and method of installation, and (b) has had a reasonable opportunity to review them. Upon surrender or vacation of the Premises, Tenant shall, at Tenant's sole cost and expense, have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached to Landlord's satisfaction. All signage shall be subject to applicable governmental permits and approvals for signs and exterior treatments.

14.     **Parking**.  Tenant shall be entitled to park in common with other tenants of the Building in those areas designated for nonreserved parking. Landlord may allocate parking spaces among Tenant and other tenants in the Building at Landlord's sole discretion. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.

15.  **Restoration**.

(a)     If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within sixty (60) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises.  If Landlord reasonably estimates the restoration time to exceed one hundred eighty (180) days from the date Landlord receives all permits, approvals, and licenses required to begin reconstruction, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than thirty (30) days after Landlord's notice.  If neither party elects to terminate this Lease or if Landlord estimates that restoration will take one hundred eighty (180) days or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events.  Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease upon thirty (30) days written notice to the other if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than thirty (30) days to repair such damage.

(b)     If the Premises are destroyed or substantially damaged by any peril not covered by the insurance maintained by Landlord or any Landlord's mortgagee requires that insurance proceeds be applied to the indebtedness secured by its mortgage (defined herein), Landlord may terminate this Lease by delivering written notice of termination to Tenant within thirty (30) days after such destruction or damage or such requirement is made known by any such Landlord's mortgagee, as applicable, whereupon all rights and obligations hereunder shall cease and terminate, except for any liabilities of Tenant which accrued prior to Lease termination.

(c)     If such damage or destruction is caused by the act(s) or omission(s) of Tenant, its employees, agents, contractors, invitees or guests, Tenant shall pay to Landlord with respect to any damage to the Premises and/or Building the amount of the commercially reasonable deductible under Landlord's insurance policy within ten (10) days after presentment of Landlord's invoice.  Base Rent and Operating Expenses shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises.  Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

16.     **Condemnation**.  If any part of the Premises, the Building or the Property should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by a sale in lieu thereof (a "Taking" or "Taken"), and (a) the Taking would prevent or materially interfere with Tenant's use of the Premises, (b) in Landlord's judgment would materially interfere with or impair its ownership or operation of the Building or (c) as a result of such Taking, Landlord's mortgagee accelerates the payment of any indebtedness securing all or a portion of the Building or the Property, then upon written notice by Landlord, this Lease shall terminate and Base Rent shall be apportioned as of said date.  If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances, and Landlord shall restore the Premises to its condition prior to the Taking; provided, however, Landlord's obligation to so restore the Premises shall be limited to the award Landlord receives in respect of such Taking that is not required to be applied to the indebtedness secured by a mortgage.  In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award, and Tenant shall immediately deliver to Landlord any such proceeds

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 18 of 74

received by Tenant. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, to the extent a separate award for such items is made.

17. **Assignment and Subletting**.

(a)    Without Landlord's prior written consent, which may be withheld in Landlord's sole discretion, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises (each being a "Transfer") and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Paragraph 17, a transfer of the ownership interests controlling Tenant shall be deemed a Transfer of this Lease unless such ownership interests are publicly traded. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any Transfer. Upon Landlord's receipt of Tenant's written notice requesting Landlord's consent to assign or sublet the Premises, or any part thereof, Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

(b)    Notwithstanding any Transfer, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such Transfer). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant.

(c)    If this Lease is assigned or if the Premises is subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder, Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding subparagraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers.

18. **Indemnification**. Tenant agrees to indemnify, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord, and Landlord's agents, employees and contractors, from and against any and all claims, demands, losses, liabilities, causes of action, suits, judgments, damages, costs and expenses (including attorneys' fees) arising from any occurrence on the Premises, the use and occupancy of the Premises, the Building or the Property, or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents, or from Tenant's failure to perform its obligations under this Lease (other than any loss arising from the sole or gross negligence of Landlord or its agents) EVEN THOUGH CAUSED OR ALLEGED TO BE CAUSED BY THE JOINT, COMPARATIVE, OR CONCURRENT NEGLIGENCE OR FAULT OF LANDLORD OR ITS AGENTS, AND EVEN

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 19 of 74

THOUGH ANY SUCH CLAIM, CAUSE OF ACTION, OR SUIT IS BASED UPON OR ALLEGED TO BE BASED UPON THE STRICT LIABILITY OF LANDLORD OR ITS AGENTS. THIS INDEMNITY PROVISION IS INTENDED TO INDEMNIFY LANDLORD AND ITS AGENTS AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT AS PROVIDED ABOVE WHEN LANDLORD OR ITS AGENTS ARE JOINTLY, COMPARATIVELY, OR CONCURRENTLY NEGLIGENT WITH TENANT. This indemnity provision shall survive termination or expiration of this Lease. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph 18.

19. **Inspection and Access**. Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers or, during the last year of the Lease Term, to prospective tenants. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Building is available for sale. Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Premises, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions. Tenant shall have access to the Premises, common areas and parking areas twenty-four (24) hours per day, seven (7) days per week. The Building operating hours will be from 7:00 a.m. to 7:00 p.m., Monday thru Friday, and from 7:00 a.m. to 1:00 p.m. on Saturday, excluding Holidays. Tenant shall pay an hourly surcharge, established by Landlord, for use of the Building mechanical systems during non-operating hours.

20. **Quiet Enjoyment**. If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord, but not otherwise.

21. **Surrender**. No act by Landlord shall be an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Paragraphs 15 and 16 excepted. Any Trade Fixtures, Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including, without limitation, indemnity obligations, payment obligations with respect to Operating Expenses and all obligations concerning the condition and repair of the Premises.

22. **Holding Over**. If Tenant fails to vacate the Premises after the termination of the Lease Term, Tenant shall be a tenant at will or at sufferance, and Tenant shall pay, in addition to any other rent or other sums then due Landlord, a daily base rental equal to 150% of the Base Rent in effect on the expiration or termination date, even if Landlord consents to such holdover (which consent shall be effective only if in writing). Tenant shall also be liable for all Operating Expenses incurred during such holdover period. In addition, Tenant shall be liable for all damages (including attorneys' fees and expenses) of whatever type (including consequential damages) incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document        Page 20 of 74

otherwise expressly provided, and this Paragraph 22 shall not be construed as consent for Tenant to retain possession of the Premises.

23.     **Events of Default**.  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)     Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of five (5) days from the date such payment was due.

(b)     Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within sixty (60) days of its filing or entry; or (iv) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)     Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(d)     Tenant shall fail to occupy or shall vacate the Premises or shall fail to continuously operate its business at the Premises for the permitted use set forth herein, whether or not Tenant is in monetary or other default under this Lease.

(e)     Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f)     Tenant shall fail to discharge or bond over any lien placed upon the Premises in violation of this Lease within thirty (30) days after any such lien or encumbrance is filed against the Premises.

(g)     Tenant shall fail to execute any instrument of subordination or attornment or any estoppel certificate within the time periods set forth in Paragraphs 27 and 29 respectively following Landlord's request for the same.

(h)     Tenant shall breach any of the requirements of Paragraph 30 and such failure shall continue for a period of five (5) days or more after notice from Landlord to Tenant.

(i)     Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 23, and except as otherwise expressly provided herein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant written notice of such default (unless such default is incapable of being cured within thirty (30) days, provided, that Tenant shall have commenced to cure such default within thirty (30) days, diligently pursues completion of same, and completes such cure not later than ninety (90) days after the Landlord shall have given Tenant notice of such default).

{H0291141.2}                                          14

24. **Landlord's Remedies**.

      (a)    Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election:

      (i)    terminate this Lease or Tenant's right of possession, in which case Tenant shall remain liable as hereinafter provided, and, without formal demand or notice of any kind, re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises, all without being deemed guilty of trespass or becoming liable for any loss, damage or damages which may be occasioned thereby;

      (ii)    without terminating this Lease, at any time, so relet the Premises or any part thereof for the account of Tenant for such term, upon such conditions and at such rental as Landlord may deem proper;

      (iii)    with or without terminating this Lease, declare all Base Rent due under this Lease for the remainder of the Lease Term immediately due and payable and thereupon such amounts shall be accelerated as provided in this paragraph, with other expenses payable by Tenant under this Lease remaining due and payable in accordance with the terms hereof; and/or

      (iv)    pursue any other remedies at law or in equity.

      (b)    The remedies under this Section 24(a) shall be cumulative, and no election of a remedy by Landlord under Section 24(a) shall preclude Landlord from electing any other remedy available under this Lease, including without limitation the right to use the Security Deposit as set out in Paragraph 5 hereof. If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including without limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and an amount in cash equal to the then present value of the Base Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease. Such present value shall be calculated at a discount rate equal to the 90-day U.S. Treasury bill rate at the date of such termination.

      (c)    If Landlord terminates Tenant's right of possession (but not this Lease) in accordance with Paragraph 24(a)(ii) hereof, Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant. For the purpose of such reletting, Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the Base Rent set out in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent and other amounts accrued hereunder at the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting (after first deducting therefrom, for retention by Landlord, the unpaid Base Rent and other amounts accrued hereunder at the time of reletting,

{H0291141.2}       15

the cost of recovering possession (including attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the expense of such reletting (including without limitation brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom) to satisfy the rent provided for in this Lease to be paid, then Tenant shall immediately satisfy and pay any such deficiency. Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(d)     Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption, if any, in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Building before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

25.     **Tenant's Remedies/Limitation of Liability**. Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within thirty (30) days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of thirty (30) days, then after such period of time as is reasonably necessary). All obligations of Landlord hereunder shall be construed as covenants, not conditions; and Tenant may not terminate this Lease for breach of Landlord's obligations hereunder or withhold payment of any amounts due to landlord pursuant to the terms of this Lease. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner of the Premises from time to time during the Lease Term, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease or arising out of the relationship between Landlord and Tenant shall be limited solely to Landlord's interest in the Building and the Property, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. Tenant agrees that if Landlord determines for any reason not to construct the Building or the Premises, Tenant shall have no rights in and to the Premises and Tenant shall have not claims against Landlord hereunder other than the right to the return of its security deposit (if any), as forth herein. Except for Tenant's right to return of its security deposit,

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document     Page 23 of 74

Landlord shall have no other liability for failure to complete the Building or the Premises or deliver possession thereof, and in the event Landlord determines not to construct the Building or the Premises, upon the return to Tenant of the security deposit, the parties hereto shall be mutually released from all obligations under the terms of this Lease and Landlord shall have no other liability for failure to construct the Building or the Premises.

26. **Waiver of Jury Trial**. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

27. **Subordination**.

(a) This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Building or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. The provisions of this Paragraph 27 shall be self-operative and no further instrument shall be required to effect such subordination or attornment; however, Tenant agrees to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be reasonably requested by Landlord any such holder within ten (10) days of such request. Tenant's obligation to furnish each such instrument requested hereunder in the time period provided is a material inducement for Landlord's execution of this Lease and any failure of Tenant to timely deliver each instrument shall be deemed an Event of Default. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded.

(b) Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

(c) Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail to any mortgage holder whose address has been given to Tenant, and affording such mortgage holder a reasonable opportunity to perform Landlord's obligations hereunder. Notwithstanding any such attornment or subordination of a mortgage to this Lease, the holder of any mortgage shall not be liable for any acts of any previous landlord, shall not be obligated to install any tenant improvements, nor shall it be bound by any amendment to which it did not consent in writing nor any payment of rent made more than one month in advance.

28. **Mechanic's Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in the Premises, the Building or the Property, in connection with those who may furnish materials or perform labor

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document         Page 24 of 74

for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such thirty (30) day period.

29. **Estoppel Certificates**. Tenant agrees, from time to time, within ten (10) days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease and any failure of Tenant to timely deliver each estoppel certificate shall be deemed an Event of Default. No cure or grace period provided in this Lease shall apply to Tenant's obligation to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within ten (10) days after Landlord's written request thereof.

30. **Environmental Requirements; Medical Waste**.

(a) Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture, dispose, or release any Hazardous Material on or from the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and all requirements of this Lease. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises, and Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Premises or Building of any Environmental Requirement.

(b) The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, permits, authorizations, orders, policies or other similar requirements of any governmental authority, agency or court regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Toxic Substances Control Act and all state and local counterparts thereto, and any common or civil law obligations including, without limitation, nuisance or trespass, and any other requirements of Paragraphs 3 and 33 of this Lease. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant that is or could be regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material not handled in accordance with applicable law). For purposes of Environmental Requirements, to the extent authorized by law, Tenant is and shall be

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document    Page 25 of 74

deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

(c)     Tenant, at its sole cost and expense, shall remove all Hazardous Materials stored, disposed of or otherwise released by Tenant, its assignees, subtenants, agents, employees, contractors or invitees onto or from the Premises, in a manner and to a level satisfactory to Landlord in its sole discretion, but in no event to a level and in a manner less than that which complies with all Environmental Requirements and does not limit any future uses of the Premises or require the recording of any deed restriction or notice regarding the Premises. Tenant shall perform such work at any time during the period of the Lease upon written request by Landlord or, in the absence of a specific request by Landlord, before Tenant's right to possession of the Premises terminates or expires. If Tenant fails to perform such work within the time period specified by Landlord or before Tenant's right to possession terminates or expires (whichever is earlier), Landlord may at its discretion, and without waiving any other remedy available under this Lease or at law or equity (including without limitation an action to compel Tenant to perform such work), perform such work at Tenant's cost. Tenant shall pay all costs incurred by Landlord in performing such work within ten (10) days after Landlord's request therefor. Such work performed by Landlord is on behalf of Tenant and Tenant remains the owner, generator, operator, transporter, and/or arranger of the Hazardous Materials for purposes of Environmental Requirements. Tenant agrees not to enter into any agreement with any person, including without limitation any governmental authority, regarding the removal of Hazardous Materials that have been disposed of or otherwise released onto or from the Premises without the written approval of Landlord.

(d)     Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Building and loss of rental income from the Building), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the Premises or disturbed in breach of the requirements of this Paragraph 30, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials or any breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph 30 shall survive any termination of this Lease.

(e)     Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. Tenant shall promptly notify Landlord of any communication or report that Tenant makes to any governmental authority regarding any possible violation of Environmental Requirements or release or threat of release of any Hazardous Materials onto or from the Premises. Tenant shall, within five (5) days of receipt thereof, provide Landlord with a copy of any documents or correspondence received from any governmental agency or other party relating to a possible violation of Environmental Requirements or claim or liability associated with the release or threat of release of any Hazardous Materials onto or from the Premises.

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document      Page 26 of 74

(f)    In addition to all other rights and remedies available to Landlord under this Lease or otherwise, Landlord may, in the event of a breach of the requirements of this Paragraph 30 that is not cured within thirty (30) days following notice of such breach by Landlord, require Tenant to provide financial assurance (such as insurance, escrow of funds or third party guarantee) in an amount and form satisfactory to Landlord. The requirements of this Paragraph 30 are in addition to and not in lieu of any other provision in the Lease.

(g)    If Tenant creates or its business operation produces any infectious waste or biohazardous waste, as defined by the applicable governmental regulations, then Tenant agrees to contract with a licensed infectious waste or biohazardous waste disposal company for pickup and disposal of the infectious waste or biohazardous waste. Tenant agrees to be solely responsible for the disposal and the expense of disposal of infectious waste or biohazardous waste created by Tenant.

31.    **Guaranty of Lease**. Tenant shall cause  Dr. Jason Locketteand Mr. Jonathan Osborne (individually a "Guarantor" and collectively the "Guarantors") to each sign and deliver to Landlord a Lease Guaranty in substantially the form attached hereto as Exhibit C (a "Guaranty"). Landlord's agreement to enter into this Lease is conditioned upon each such Guarantor executing and delivering a Guaranty.

32.    **Rules and Regulations**. Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Building and delivered in writing to the Tenant, including, without limitation, those rules and regulations attached hereto as Exhibit D (the "Rules and Regulations"). In the event of any conflict between said Rules and Regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Building.

33.    **Security Service**. Tenant acknowledges and agrees that, while Landlord may (but shall not be obligated to) patrol the Premises, the Building, or the Property, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

34.    **Force Majeure**. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

35.    **Brokers**. Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the Tenant Broker, if any, set forth on the second page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction. Tenant acknowledges that Triad Properties Corporation has brokered this lease on behalf of Landlord.

36.    **Landlord's Lien/Security Interest**. Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situate in, or upon, or used

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
                            Document        Page 27 of 74

in connection with the Premises (except merchandise sold in the ordinary course of business) (collectively, the "Collateral") as security for all of Tenant's obligations hereunder, including without limitation, the obligation to pay rent. Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Paragraph 36 and inventory, equipment, contract rights, accounts receivable and the proceeds thereof. In order to perfect such security interest, simultaneously with the execution of this Lease, Landlord may file original financing statements at the appropriate state and county Uniform Commercial Code filing offices. Tenant hereby irrevocably appoints Landlord its agent for the purpose of filing such financing statements on Tenant's behalf as Landlord shall deem necessary.

37.     **Limitation of Liability of Landlord's Partners, and Others**.  Tenant agrees that any obligation or liability whatsoever of Landlord which may arise at any time under this Lease, or any obligation or liability which may be incurred by Landlord pursuant to any other instrument, transaction, or undertaking contemplated hereby, shall not be personally binding upon, nor shall resort for the enforcement thereof be had to the property of the members of Landlord or any of their respective co-owners, members, managers, directors, officers, representatives, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

38.     **Option to Renew.**  Provided Tenant is not in default under this Lease, Tenant may, at its option, by giving Landlord one hundred eighty (180) days' prior written notice of its intention, renew this Lease for one (1) additional period of five (5) years (the "Renewal Term") upon the same terms and conditions contained herein, with the exception of the Base Rent which shall continue to escalate at two percent (2%) per annum during each Renewal Term. Tenant shall have no other rights to extend or renew the Lease Term.

39.     **Compliance with Applicable Laws; Fraud and Abuse.**

        (a)     The parties hereto shall comply with all applicable federal, state and local laws, regulations and restrictions in carrying out their respective obligations under this Lease.

        (b)     This Lease is intended by the parties to comply fully with the safe harbor regulations under the illegal remuneration provisions, relating to leasing of space, set forth pursuant to 42 U.S.C. § 1320a-7b of the Social Security Act and at 42 C.F.R. §1001.952(i). Notwithstanding any unanticipated effect of any of the provisions herein, neither party will intentionally conduct itself or himself under the terms of this Lease in a manner to constitute a violation of the Medicare and Medicaid fraud and abuse provisions, including, but not limited to the Medicare Anti Kick-Back Law (42 U.S.C. § 1320a-7b) and the Stark Self-Referral Prohibition Act (42 U.S.C. 1395nn *et seq.*). No payment, direct or indirect, overt or covert, in cash or in kind, made or received under this Lease is in return for the referral of patients or in return for the purchasing, leasing, ordering, or arranging for or recommending the purchasing, leasing, or ordering of any good, service, item or product. Tenant may refer patients to any hospital or other entity providing such products or services, and will make such referrals, if any, consistent with Tenant's professional medical judgment and the need of each individual patient.

40.     **Miscellaneous**.

        (a)     Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

        (b)     If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)     All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery and, if to Tenant, addressed to Tenant at the address for Tenant noted on the first page of this Lease, and if to Landlord, addressed to Landlord at c/o Triad Properties Corporation, 100 Church Street, Suite 100, Huntsville, Alabama 35801, Attention: Gerry E. Shannon. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery.

(d)     Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e)     At Landlord's request from time to time, Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders. Such annual statements shall be compiled by an independent certified public accountant at Tenant's sole cost and expense. Landlord shall hold such financial statements and information in confidence, and shall not disclose the same except: (i) to Landlord's lenders or potential lenders, (ii) to potential purchasers of all or a portion of the Building, (iii) otherwise as reasonably necessary for the operation of the Building or administration of Landlord's business or (iv) if disclosure is required by any judicial or administrative order or ruling.

(f)     Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord, Tenant will execute a memorandum of lease.

(g)     Each party acknowledges that it has had the opportunity to consult counsel with respect to this Lease, and therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)     Any amount not paid by Tenant within five (5) days after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or fifteen percent (15%) per year. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 29 of 74

execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k)     Construction and interpretation of this Lease shall be governed by the laws of the State of Alabama, excluding any principles of conflicts of laws.

(l)     Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)     All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda (other than the Rules and Regulations) and the terms of this Lease, such exhibits or addenda shall control. In the event of a conflict between the Rules and Regulations and the terms of this Lease, the terms of this Lease shall control.

(n)     If either party should prevail in any litigation instituted by or against the other related to this Lease, the prevailing party, as determined by the court, shall receive from the non-prevailing party all costs and reasonable attorneys' fees (payable at standard hourly rates) incurred in such litigation, including costs on appeal, as determined by the court.

41.     **Entire Agreement**.  This Lease constitutes the complete and entire agreement of Landlord and Tenant with respect to the subject matter hereof.  No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

42.     **Severability**.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

43.     **Counterpart Execution**.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original, but when taken together shall constitute only one agreement, and a facsimile signature shall be deemed an original signature for all purposes.

Case 22-80871-CRJ7     Doc 10     Filed 07/11/22     Entered 07/11/22 16:24:34     Desc Main
Document     Page 30 of 74

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

**TENANT:**

**WITNESS:**

**INTEGRITY FAMILY CARE NORTH ALABAMA, LLC,** an Alabama limited liability company

By: _____
Name: _Jason Lockette_____
Title: _President_____

**LANDLORD:**

**WITNESS:**

**MADISON MEDICAL I, LLC,** an Alabama limited liability company

By:     TRIAD PROPERTIES HOLDINGS, LLC
Its:     Manager

By: _____
Name: _William R. Stroud_____
Title: _Manager_____

**Exhibit A**
**Premises**



**4**
08/23/16

**Integrity Family Care**
Madison Medical 1 - Third Floor

TRIAD PROPERTIES | Chapman Sisson

{H0291141.2}

**Exhibit A-1**

**Legal Description of Real Property**

Lot 4 according to the Map of Survey of Madison Corners Phase II – A Resubdivision of Lots 1 & 3 of Madison Corners Subdivision as recorded in Document Number 20110923000501370 in the Office of the Judge of Probate, Madison County, Alabama.

Together With: Rights, easements and drainage rights as defined and set out in that certain Development Agreement by and between Gayle Wann Guy, William Farley Wann, and The Health Care Authority of the City of Huntsville by document recorded as Document No. 20051006000685840, Probate Records of Madison County, Alabama.

Together With: Rights in favor of Grantee as set out in that certain Deed from Sarah Farley Wann to The Health Care Authority of the City of Huntsville, recorded December 18, 1997, in Official Records Book 911, Page 31, of the Public Records of Madison County, Alabama.

{H0291141.2}

<u>**EXHIBIT B**</u>

**WORK AGREEMENT**

This Work Agreement is attached to and made a part of that certain Lease Agreement dated the 26th day of September, 2016, between **MADISON MEDICAL I, LLC**, an Alabama limited liability company ("**Landlord**"), and the Tenant named herein ("**Tenant**").

To induce Tenant to enter into said Lease (which is hereby incorporated by reference to the extent that the provisions of this Work Agreement may apply thereto) and in consideration of the mutual covenants hereinafter contained, Landlord and Tenant mutually agree as follows:

**ARTICLE 1**
<u>**Definitions**</u>

The terms defined in this Paragraph 1, for all purposes of this Work Agreement, shall have the meanings herein specified, and, in addition to the terms defined herein, the definitions in the Lease shall also apply to this Work Agreement.

"**Building Shell**" means the Building with the following improvements substantially completed: (a) outside walls and unfinished concrete floors; (b) Building Standard power supplied to panels provided on floors; (c) men's and ladies' lobby restroom facilities with standard finishes; (d) primary HVAC ducts located on each floor of the Building; (e) main elevator lobby of the Building; (f) adequate vertical transportation for contractors and subcontractors to perform tenant finish construction work; and (g) sprinkler risers on each floor of the Building.

"**Building Standard**" shall mean the quantity and quality of materials, finishing and workmanship specified by Landlord in the plans and specifications for the Building.

"**Cost of Tenant's Work**" shall mean the total cost of design and construction of Tenant's Work, including all architectural, four percent construction management fee, and engineering fees, Interior Design Services, all Project Contractor costs, and all permits and fees relating to or resulting from the construction of the Tenant's Work.

"**Dried In Condition**" shall mean the condition of the Premises when Landlord has (a) provided reasonable vertical transportation to the Premises to permit Tenant's Work (hereinafter defined) to commence and proceed, (b) completed the outside walls and unfinished concrete floors of the next higher Building level to the extent necessary to protect the Premises in question from the elements, and (c) provided access to Building Standard utilities on each floor on which the Premises is located.

"**Expenditure Authorization**" shall mean an authorization by Tenant to Landlord to expend funds on behalf of Tenant for Tenant's Work on the Premises.

"**Landlord's Work**" shall mean the Building Standard items which are supplied, installed and finished by Landlord, according to the Building Standard plans and specifications which have been provided to Tenant and which complete the Premises to Building Shell condition.

"**Plans and Specifications**" shall mean the final construction documents for the Premises, prepared by the Project Architect, and based on the Tenant's Space Plan, and shall include all architectural, engineering, mechanical, electrical, and plumbing specifications for the Premises

{H0291141.2}

"**Project Architect**" shall mean the person or firm selected by Landlord, which may be the Architect, to prepare Tenant's Space Plan and the Plans and Specifications for Tenant's Work.

"**Project Contractor**" shall mean the person or firm from time to time selected by Landlord to perform Tenant's Work in the Premises.

"**Tenant Improvement Allowance**" shall mean the total dollar amount provided by Landlord to Tenant for the architectural and engineering costs to design the Premises, the cost of "Tenant's Work," the cost of all "Interior Design Services", which amount shall equal the product of Seventy-Five and No/100 Dollars ($75.00), multiplied by the total number of square feet of Net Rentable Area in the Premises. **Any cost or expense in excess of the "Tenant Improvement Allowance" will be borne by Tenant**.

[Tenant to initial]

"**Tenant's Work**" shall mean the items which are supplied, installed and finished by Landlord on behalf of Tenant (or by Tenant on its own behalf if Tenant elects to supply, install, and finish such items), as provided for herein below, which exceed the Building Shell condition, and which shall be paid for by Tenant as provided for herein.

"**Net Rentable Area**" shall mean the net rentable square footage of the Premises to be determined by the final Plans and Specifications, which is currently estimated to be 8,533 square feet.

## ARTICLE 2
### Plans and Specifications

**SECTION 2.1     Space Plan**. The Project Architect designated by Landlord for the Building will prepare a space plan for the Premises showing the location and layout of all of Tenant's Work which includes partitions, door, casework, elevations and other construction improvements on the Premises (the "Space Plan"). Tenant will cooperate with the Project Architect, furnishing all reasonable information, programming requirements, and material concerning Tenant's organization, staffing, growth expectations, physical facility needs, equipment specifications and other information and material necessary for the Project Architect to efficiently and expeditiously design an acceptable layout of and Space Plan for the Premises. Tenant shall promptly respond to requests from the Project Architect and will promptly review the Space Plan.

**SECTION 2.2     Space Plan Approval**. The Space Plan must be approved in writing by both Landlord and Tenant within ninety (90) days after the Effective Date of the Lease, and preparation of the Plans and Specifications by Project Architect shall not commence prior to such approval. If at anytime after approval of the Space Plan, any redrawing of the Space Plan is necessitated by Tenant's requested changes, the expense of any redrawing shall be borne by Tenant.

**SECTION 2.3     Interior Design Service**. If Tenant shall arrange for interior design services ("Interior Design Services"), whether with the Project Architect for the Building or with any other planner or designer, it shall be Tenant's responsibility and expense to cause necessary coordination of its planners' and designers' efforts with the efforts of the Project Architect to insure that no delays are caused to either the planning or construction of the required Landlord's Work.

## ARTICLE 3
### Completion of Premises.

**SECTION 3.1     Project Contractor**. Unless otherwise agreed to in writing by Landlord and Tenant, all work involved in completion of Landlord's Work and Tenant's Work shall be carried out by

{H0291141.2}

Project Contractor under the sole direction of Landlord. Tenant shall cooperate with Landlord and Project Contractor to promote the efficient and expeditious completion of such work. Tenant shall cause Project Architect to submit the final Plans and Specifications to both Tenant and Landlord. Within thirty (30) days after receipt of such final Plans and Specifications, Landlord will submit to Tenant written estimates of the cost of Tenant's Work from Project Contractor. Tenant shall accept or reject such cost estimates within five (5) business days after receipt of the same by delivering to Landlord its Expenditure Authorization. If Tenant rejects or fails to respond to such cost estimates within such five (5) day period, Landlord shall not carry out any of Tenant's Work set forth in such Plans and Specifications until written approval thereof is received. In the event that Tenant rejects or fails to respond to such cost estimates within such five (5) day period, Tenant shall have until the tenth (10th) day following such five (5) day period in which to cause Project Architect to modify the Plans and Specifications, submit to Landlord for its approval, and then resubmit all or any part of the Plans and Specifications plans, if necessary, and to accept new bids from Project Contractor. Tenant agrees that it shall be responsible for any and all reasonable increases in the cost of Tenant's Work resulting from governmental requirements during Tenant's Work, whether such increases occur before the cost estimates are initially submitted to Tenant, or after all final bids have been taken and such cost estimates have been approved by Tenant.

(a)     Any delay caused by Tenant in connection with the completion of Tenant's Work by Project Contractor pursuant to this Section 3.1 shall in no event delay the Commencement Date or the payment of Rent; provided, however, that any such delay shall extend the time allowed for Project Contractor to complete the work in question. By way of illustration, and not in limitation, of the foregoing:

(1)     Any delay caused by Tenant's failure to approve cost estimates within the time periods set forth in Section 3.1(a) above shall be charged to Tenant.

(2)     Any delay resulting from a failure by Tenant to approve or reasonably reject any shop drawings, samples, mock-ups or models within five (5) days of submission thereof shall be charged to Tenant.

(3)     In the event Tenant requires specific products to be used in completion of Tenant's Work, any delay whatsoever which results from Tenant's review of shop drawings, samples, mock-ups, or models, or which results from Tenant's later rejection of the specified products, shall be charged to Tenant, and if Tenant specifies particular suppliers of any material, any delay which results from a failure by such supplier to comply with delivery schedules necessary to maintain the normal progression of the work shall be charged to Tenant.

(4)     Any delay which results from unavailability or delay in the delivery of any special equipment, including, but not limited to, computer systems, special communications, equipment, or other equipment not associated with normal office uses, shall be charged to Tenant.

(5)     Any delay, which results from Tenant's requests for changes in the components of Landlord's Work, shall be charged to Tenant.

(b)     Tenant agrees to pay Landlord the total contract cost of all Tenant's Work to complete the Tenant's Work in excess of the Tenant Improvement Allowance, within ten (10) business days after being billed therefor. Landlord shall bill for and receive 100% of any such excess arising in connection with Plans and Specifications or Interior Design Services (the determination of whether an excess exists for such items being determined by subtracting the Tenant Improvement Allowance from the Cost of Tenant's Work) prior to commencement of construction of Tenant Work. Tenant agrees that in the event

{110291141 2}

of default of payment thereof, Landlord shall (in addition to all other remedies) have the same rights as in the event of default of payment of Rent under the Lease.

(c)     In the event Project Contractor is unable to substantially complete Tenant's Work on or before the date which would otherwise be the Commencement Date (except to the extent such delay is chargeable to Tenant as set forth in this Section 3 or as otherwise provided in the Section 3.2 of the Lease), Tenant shall be entitled to postpone the commencement of the payment of Base Rental with respect to the Premises until such substantial completion is achieved; provided, however, that for purposes hereof, Tenant's Work shall be deemed "substantially completed" if such work has been completed except for normal "punch list" items which can reasonably be completed after occupancy of the Premises by Tenant without substantial interference with the conduct by Tenant of Tenant's business.

.   Under no circumstances whatsoever will Tenant or Tenant's authorized representative ever alter or modify or in any manner disturb any system or installation of the Building, including, but not limited to, Central plumbing system, Central electrical system, Central heating, ventilating and air conditioning systems, Central fire protection and fire alert systems, Central building maintenance systems, Central structural systems, elevators and anything located within the Central core of the Building, nor shall Tenant's Work cause any increase in maintenance, insurance, fees or utility charges to be incurred by Landlord. Any such additional charges that are incurred by Landlord by reason of Tenant's Work shall be reimbursed by Tenant to Landlord immediately upon demand by Landlord therefor. Only in accordance with approved Plans and Specifications and with Landlord's express written permission and under direct supervision of Landlord or Project Contractor shall Tenant or Tenant's authorized representative alter, add to or modify, or in any manner disturb any Branch of any system or installation of the Building which is located within the Premises, including, but not limited to, Branch plumbing system, Branch electrical system, Branch heating, ventilating and air conditioning system, and Branch fire protection and alert system (for the purposes of this Section 3.3 "Central" shall be defined as that portion of any Building system or component which is within the core and/or common to and/or serves or exists for the benefit of other tenants in the Building, and shall include, but not be limited to, main fire loops on each floor of the Building and duct work to the VAV box; and "Branch" shall be defined as that portion of any Building system or component which serves to connect or extend Central systems into the Premises).

**SECTION 3.2     Changes to Tenant's Work**. If there are any changes in Tenant's Work by or on behalf of Tenant, from the work as reflected in the final Plans and Specifications, each such change must receive the prior written approval of Landlord and must be paid for by Tenant to the extent that the cost thereof exceeds the Tenant Improvement Allowance, and in the event of any such approved change in the final Plans and Specifications, Tenant shall, upon completion of Tenant's Work, furnish Landlord with accurate "as-built" plans of Tenant's Work as constructed, which plans shall be incorporated into this Work Agreement by this reference for all intents and purposes.

**SECTION 3.3     Alterations**. Under no circumstances whatsoever will Tenant or Tenant's authorized representative ever alter or modify or in any manner disturb any system or installation of the Building, including, but not limited to, Central plumbing system, Central electrical system, Central heating, ventilating and air conditioning systems, Central fire protection and fire alert systems, Central building maintenance systems, Central structural systems, elevators and anything located within the Central core of the Building, nor shall Tenant's Work cause any increase in maintenance, insurance, fees or utility charges to be incurred by Landlord. Any such additional charges that are incurred by Landlord by reason of Tenant's Work shall be reimbursed by Tenant to Landlord immediately upon demand by Landlord therefor. Only in accordance with approved Plans and Specifications and with Landlord's express written permission and under direct supervision of Landlord or Project Contractor shall Tenant or Tenant's authorized representative alter, add to or modify, or in any manner disturb any Branch of any system or installation of the Building which is located within the Premises, including, but not limited to,

Branch plumbing system, Branch electrical system, Branch heating, ventilating and air conditioning system, and Branch fire protection and alert system (for the purposes of this Section 3.3 "Central" shall be defined as that portion of any Building system or component which is within the core and/or common to and/or serves or exists for the benefit of other tenants in the Building, and shall include, but not be limited to, main fire loops on each floor of the Building and duct work to the VAV box; and "Branch" shall be defined as that portion of any Building system or component which serves to connect or extend Central systems into the Premises).

**SECTION 3.4     Codes for Design, Construction and Installation**.  All design, construction and installation shall conform to the requirements of applicable building, plumbing, electrical and fire codes and the requirements of any authority having jurisdiction over or with respect to such work, as such codes and requirements may from time to time be amended, supplemented, changed or interpreted. Furthermore, all such design, construction and installation of Tenant's Work must always receive written approval of Landlord or Project Contractor, as the case may be, prior to commencement.

**SECTION 3.5     Building Standard Materials**.  Tenant agrees to use, as a part of Tenant's Work, Building Standard materials including, but not limited to, Building Standard corridor and interior doors, hardware, lights or other materials unless other corridor or interior doors, hardware or lights are requested by Tenant and approved by Landlord.

**SECTION 3.6     Cost of Completing Tenant's Work**.  Tenant shall bear all costs of completing Tenant's Work, including without limitation, costs of the Plans and Specifications, permits, four percent construction management fee, direct supervision of Tenant's Work and all costs of construction to improve the Premises to a condition greater than Building Shell condition.  Tenant shall be entitled to apply the Tenant Improvement Allowance, but all costs incurred by Landlord in completing the Tenant's Work in excess of the Tenant Improvement Allowance shall be borne by Tenant.  Tenant agrees that in the event of a default of payment thereof, Landlord (in addition to all other remedies) has the same rights as in the event of default of payment of Rent under the Lease.  Notwithstanding any provision contained herein to the contrary, it is understood and agreed that Landlord shall have no obligation to commence installation of any Tenant's Work in the Premises until Tenant shall have caused to be furnished to Landlord and Landlord shall have approved the final Plans and Specifications working drawings as required by the provisions hereof.  Notwithstanding the review and approval by Landlord of Tenant's final Plans and Specifications, Landlord shall have no responsibility or liability in regard to the safety, sufficiency, adequacy or legality thereof.

**SECTION 3.7     Approval of Work to be carried out by someone other than Project Contractor**.  If Tenant requests and Landlord agrees to allow Tenant Work to be carried out by someone other than Project Contractor under the direction of Landlord, Tenant and Landlord shall execute a supplemental Work Agreement that shall provide for oversight by Landlord of Tenant's contractor and that shall specify requirements for lien waiver, insurance and times and methods of conducting construction work in the Building.

## ARTICLE 4
### Landlord's Work.

**SECTION 4.1     Landlord's Contribution to the Tenant's Work**.  As Landlord's contribution to the Tenant's Work, Landlord will complete the Premises to Building Shell condition at Landlord's expense and will provide the Tenant Improvement Allowance (subject to the terms and conditions hereof) to be used by Tenant to pay for all or a portion of the cost of completion of the Tenant's Work.

{H0291141 2}

**SECTION 4.2     The Costs of Modifications and Changes from Building Standard.**  The costs of modifications and changes requested by Tenant from Building Standard for any item will include the cost of architectural and engineering design and the increased costs of construction, and such costs will be paid by Tenant.

{H0291141.2}

**Exhibit C**
**Form of Lease Guaranty**
**LIMITED LEASE GUARANTY**

      As a material inducement to Madison Medical I, LLC (together with its successors and assigns called the "Landlord"), to enter into that certain Lease Agreement dated of even date herewith (as amended, modified, renewed or extended from time to time, the "Lease") (a copy of which is attached hereto) with Integrity Family Care North Alabama, LLC ("Tenant"), the undersigned (the "Guarantor"), hereby (a) unconditionally and irrevocably guarantees to Landlord the prompt payment when and as due and payable, all rent and all other sums payable by Tenant under the Lease and the faithful and prompt performance when due of each and every one of the terms, conditions, covenants and obligations to be kept and performed by Tenant under the Lease (collectively, the "Lease Obligations"); (b) agrees to be bound by all of the terms and provisions of the Lease just as though executed by the Guarantor; (c) agrees that the Landlord will not be required first to resort to the Tenant or any other endorser, surety or guarantor (each of them being hereinafter individually called an "Obligor") or to any other guaranty or security (collectively, the "Collateral") pledged or granted to it (collectively, the "Security Documents"); (d) agrees that the obligations of the undersigned hereunder are absolute, unconditional, present and continuing guaranties of payment and performance not collectability and shall not be subject to any counterclaim, recoupment, set-off, reduction or defense based upon any claim that the undersigned, or any of them, may have against the Tenant, the Landlord, or any Obligor; (e) agrees that the obligations and liabilities of the undersigned hereunder shall not be discharged, impaired, modified or otherwise affected by (i) the unenforceability of the Lease, any of the Lease Obligations or any Security Document, (ii) any understanding or agreement that any other person or entity was or is to sign, guarantee or become bound on or for any Lease Obligations, (iii) the release, discharge or disposal of any of the Collateral or any Obligor, (iv) the death or bankruptcy of any Obligor, (v) any default by Tenant under the Lease or any Security Document, (vi) any compromise, settlement, release, discharge, termination, waiver or extension of time for payment performance or observance of, any of the Lease Obligations, (vii) the manner of application of any payments, proceeds of Collateral or other sums to the Lease Obligations as the Landlord may elect, (viii) any exercise or non-exercise of any right, remedy, power or privilege of the Landlord with respect to the Lease Obligations, any Collateral or any Obligor, or (ix) any waiver, release, failure, omission, delay or lack of diligence on the part of Landlord to enforce, assert or exercise any such right, power, privilege or remedy; (f) agrees that it shall not be necessary for the Landlord to give the undersigned notice of, or obtain consent or approval of the undersigned, for any of the foregoing; and (g) agrees that, until all Lease Obligations of Tenant under the Lease shall have been performed, satisfied and discharged in full, the undersigned shall have no right of subrogation and hereby waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord with respect to the Lease; provided, however, it is agreed that the Guarantor's obligation to make payments with respect to Lease Obligations shall not exceed _____% (the "Guarantor Percent") of the total Lease Obligation, which Guarantor Percent when added to the Guarantor Percentages of other owners of the Tenant will equal 125%; provided, however, if the Guarantor is the sole guarantor of the Tenant's obligations, the Guarantor percent shall be 100%.

      Executed as of the _____ day of _____, 2016.

WITNESS:


_____     _____
            SIGNATURE                             SIGNATURE
PRINT NAME: _____    PRINT NAME: _____

{H0291141.2}

**Exhibit D**

**Building Rules and Regulations**

1.      No smoking shall be permitted within any portion of the building or within twenty (20) feet of the Building's exterior doors, including tenant spaces and common areas.

2.      Landlord may provide and maintain a directory for all tenants of the Building.  No signs, advertisements or notices visible to the general public shall be permitted the Project without the prior written consent of Landlord.  Landlord shall have the right to remove any such signs, placard, picture, advertisement, name or notice placed in violation of this rule without notice to and at the expense of the applicable tenant.

3.      Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by tenants or used by any tenant for any purpose other than ingress and egress to and from the leased premises and for going from one to another part of the Building.  At no time shall any tenant permit its employees, agents, contractors or invitees to loiter in common areas or elsewhere in or about the Building or Project.

4.      Corridor doors, when not in use, shall be kept closed.

5.      Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags, food or other unsuitable material shall be thrown or placed therein.  Every tenant shall be responsible for ensuring that its employees, agents, contractors and invitees utilize Common Area restrooms in accordance with generally accepted practices of health, cleanliness and decency.

6.      Landlord shall provide all locks for doors into each tenant's lease area at tenant's expense, and no tenant shall place any additional lock or locks on any door in its leased area without Landlord's prior written consent.  Two keys for each lock on the doors in each tenant's leased areas shall be furnished by Landlord.  Additional keys shall be made available to tenants at the cost of the tenant requesting such keys.  No tenant shall have any duplicate keys made except by Landlord.  All keys shall be returned to Landlord at the expiration or earlier termination of the applicable lease.

7.      A tenant may use microwave ovens and coffee brewers in kitchen or break areas.  Except as expressly authorized by Landlord in writing, no other appliance or other devices are permitted for cooking or heating of food or beverages in the Building.  No portable heaters, space heaters or any other type of supplemental heating device or equipment shall be permitted in the Building.  All tenants shall notify their employees that such heaters are not permitted.

8.      All tenants will refer all contractors, subcontractors, contractors' representatives and installation technicians who are to perform any work within the Building to Landlord before the performance of any work.  This provision shall apply to all work performed in the Building including but not limited to installation of telephone and communication equipment, medical type equipment, electrical devices and attachments, and any and all installations of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building.

9.      Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by a tenant of any heavy equipment, bulky material or merchandise which require the use of elevators, stairways, or lobby areas shall be restricted to hours designated by Landlord.  A tenant must seek

{H0291141.2}

Landlord's prior approval by providing in writing a detailed listing of any such activity. If approved by Landlord, such activity shall be performed in the manner stated by Landlord.

10. All deliveries to or from the Building shall be made only at such times, in the manner and through the areas, entrances and exits designated by Landlord.

11. No portion of any tenant's leased area shall at any time be used for sleeping or lodging quarters. No birds, animals or pets of any type, with the exception of guide dogs accompanying visually impaired persons, shall be brought into or kept in, on or about any tenants leased area.

12. No tenant shall make or permit any loud or improper noises in the Building or otherwise interfere in any way with other tenants or persons having business with them.

13. Each tenant shall endeavor to keep its leased area neat and clean. Nothing shall be swept or thrown into the corridors, halls, elevator shafts, stairways or other common areas, nor shall tenants place any trash receptacles in these areas.

14. No tenant shall employ any persons for the purpose of cleaning other than the authorized cleaning and maintenance personnel for the building, unless otherwise approved in writing by Landlord. The work of cleaning personnel shall not be hindered by a tenant after 5:30 P.M. local time, and such cleaning work may be done at any time when the offices are vacant. Exterior windows and common areas may be cleaned at any time.

15. To insure orderly operation of the Building, Landlord reserve the right to approve all concessionaires, vending machine operators or other distributors of cold drinks, coffee, food or other concessions, water, towels or newspapers. No tenant shall install a vending machine in the Building without obtaining Landlord's prior written approval, which shall not be unreasonably withheld; provided, however, any vending machine installed in the Building shall not exceed the weight load capacity of the floor where such machine is to be installed; and Landlord reserves the right to require that such vending machine be separately metered in accordance with this Lease, and that such vending machine be equipped with an automatic device that reduces the power consumption of such machine during non-peak hours of use of such machine.

16. Landlord shall not be responsible to tenants, their agents, contractors, employees or invitees for any loss of money, jewelry or other personal property from the Premises or public areas or for any damages to any property therein from any cause whatsoever whether such loss or damage occurs when an area is locked against entry or not.

17. All tenants shall exercise reasonable precautions in protection of their personal property from loss or damage by keeping doors to unattended areas locked. Tenants shall also report any thefts or losses to the Building Manager as soon as reasonably possible after discovery and shall also notify the Building Manager of the presence of any persons whose conduct is suspicious or causes a disturbance. The tenant shall be responsible for notifying appropriate law enforcement agencies of any theft or loss of any property of tenant or its employees, agents, contractors, or invitees.

18. No tenant shall solicit from or circulate advertising material among other tenants of the Building except through the regular use of the U.S. Postal Service. A tenant shall notify the Building Manager or the Building personnel promptly if it comes to its attention that any unauthorized persons are soliciting from or causing annoyance to tenants, their employees, guests or invitees.

{H0291141.2}

19. Landlord reserves the right to deny entrance to the building or remove any person or persons from the Building in any case where the conduct of such person or persons involves a hazard or nuisance to any tenant of the Building or to the public or in the event of other emergency, riot, civil commotion or similar disturbance involving risk to the Building, tenants or the general public.

20. All requests for overtime air conditioning or heating must be submitted in writing to the Building Management office by noon on the day desired for weekday requests, by noon on Friday for weekend requests, and by noon on the proceeding business day for Holiday requests.

21. Tenants shall only utilize the termite and pest extermination service designated or approved by Landlord.

22. No tenant shall install, operate or maintain in its leased premises or in any other area of the Building, any electrical equipment which does not bear the U/L (Underwriters Laboratories) seal of approval, or which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation as determined by Landlord, taking into consideration the overall electrical system and the presence and future requirements therefore in the Building.

23. Tenants parking in the Building Parking Area will be in compliance with all parking rules and regulations including any sticker or other identification system established by Landlord. Failure to observe the rules and regulations shall terminate an individual's right to use the Building Parking Area and subject the vehicle in violation to removal and or impoundment. Parking stickers or other forms of identification supplied by Landlord shall remain the property of Landlord and not the property of a tenant and are not transferable. The owner of the vehicle or its driver assumes all risk and responsibility for damage, loss or theft to vehicles personal property or person while such vehicle is in the Building Parking Area.

24. Each Tenant shall observe Landlord's reasonable rules with respect to maintaining standard window coverings at all windows in its leased premises so that the Building presents a uniform exterior appearance. Each tenant shall ensure that to the extent reasonably practical, window coverings are closed on all windows in its leased premises while they are exposed to the direct rays of the sun.

25. Bicycles and other vehicles are not permitted inside or on the walkways outside the Building, except in those areas specifically designated by Landlord for such purposes and except as may be needed or used by a physically handicapped person.

26. Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall be needed from time to time for the safety, protection, care and cleanliness of the Building, the operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invites, which rules and regulations, when made and written notice thereof is given to a tenant, shall be binding upon it in like manner as if originally herein prescribed.

{H0291141.2}

# LIMITED LEASE GUARANTY

As a material inducement to Madison Medical I, LLC (together with its successors and assigns called the "Landlord"), to enter into that certain Lease Agreement dated of even date herewith (as amended, modified, renewed or extended from time to time, the "Lease") (a copy of which is attached hereto) with Integrity Family Care North Alabama, LLC ("Tenant"), the undersigned (the "Guarantor"), hereby (a) unconditionally and irrevocably guarantees to Landlord the prompt payment when and as due and payable, all rent and all other sums payable by Tenant under the Lease and the faithful and prompt performance when due of each and every one of the terms, conditions, covenants and obligations to be kept and performed by Tenant under the Lease (collectively, the "Lease Obligations"); (b) agrees to be bound by all of the terms and provisions of the Lease just as though executed by the Guarantor; (c) agrees that the Landlord will not be required first to resort to the Tenant or any other endorser, surety or guarantor (each of them being hereinafter individually called an "Obligor") or to any other guaranty or security (collectively, the "Collateral") pledged or granted to it (collectively, the "Security Documents"); (d) agrees that the obligations of the undersigned hereunder are absolute, unconditional, present and continuing guaranties of payment and performance not collectability and shall not be subject to any counterclaim, recoupment, set-off, reduction or defense based upon any claim that the undersigned, or any of them, may have against the Tenant, the Landlord, or any Obligor; (e) agrees that the obligations and liabilities of the undersigned hereunder shall not be discharged, impaired, modified or otherwise affected by (i) the unenforceability of the Lease, any of the Lease Obligations or any Security Document, (ii) any understanding or agreement that any other person or entity was or is to sign, guarantee or become bound on or for any Lease Obligations, (iii) the release, discharge or disposal of any of the Collateral or any Obligor, (iv) the death or bankruptcy of any Obligor, (v) any default by Tenant under the Lease or any Security Document, (vi) any compromise, settlement, release, discharge, termination, waiver or extension of time for payment performance or observance of, any of the Lease Obligations, (vii) the manner of application of any payments, proceeds of Collateral or other sums to the Lease Obligations as the Landlord may elect, (viii) any exercise or non-exercise of any right, remedy, power or privilege of the Landlord with respect to the Lease Obligations, any Collateral or any Obligor, or (ix) any waiver, release, failure, omission, delay or lack of diligence on the part of Landlord to enforce, assert or exercise any such right, power, privilege or remedy; (f) agrees that it shall not be necessary for the Landlord to give the undersigned notice of, or obtain consent or approval of the undersigned, for any of the foregoing; and (g) agrees that, until all Lease Obligations of Tenant under the Lease shall have been performed, satisfied and discharged in full, the undersigned shall have no right of subrogation and hereby waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord with respect to the Lease; provided, however, it is agreed that the Guarantor's obligation to make payments with respect to Lease Obligations shall not exceed 62.50% (the "Guarantor Percent") of the total Lease Obligation, which Guarantor Percent when added to the Guarantor Percentages of other owners of the Tenant will equal 125%; provided, however, if the Guarantor is the sole guarantor of the Tenant's obligations, the Guarantor percent shall be 100%.

Executed as of the _26th_ day of _September_, 2016.

WITNESS:

_____
SIGNATURE

_____
SIGNATURE

PRINT NAME: _William R. Strong_          PRINT NAME: MR. JONATHAN OSBORNE

## LIMITED LEASE GUARANTY

As a material inducement to Madison Medical I, LLC (together with its successors and assigns called the "Landlord"), to enter into that certain Lease Agreement dated of even date herewith (as amended, modified, renewed or extended from time to time, the "Lease") (a copy of which is attached hereto) with Integrity Family Care North Alabama, LLC ("Tenant"), the undersigned (the "Guarantor"), hereby (a) unconditionally and irrevocably guarantees to Landlord the prompt payment when and as due and payable, all rent and all other sums payable by Tenant under the Lease and the faithful and prompt performance when due of each and every one of the terms, conditions, covenants and obligations to be kept and performed by Tenant under the Lease (collectively, the "Lease Obligations"); (b) agrees to be bound by all of the terms and provisions of the Lease just as though executed by the Guarantor; (c) agrees that the Landlord will not be required first to resort to the Tenant or any other endorser, surety or guarantor (each of them being hereinafter individually called an "Obligor") or to any other guaranty or security (collectively, the "Collateral") pledged or granted to it (collectively, the "Security Documents"); (d) agrees that the obligations of the undersigned hereunder are absolute, unconditional, present and continuing guaranties of payment and performance not collectability and shall not be subject to any counterclaim, recoupment, set-off, reduction or defense based upon any claim that the undersigned, or any of them, may have against the Tenant, the Landlord, or any Obligor; (e) agrees that the obligations and liabilities of the undersigned hereunder shall not be discharged, impaired, modified or otherwise affected by (i) the unenforceability of the Lease, any of the Lease Obligations or any Security Document, (ii) any understanding or agreement that any other person or entity was or is to sign, guarantee or become bound on or for any Lease Obligations, (iii) the release, discharge or disposal of any of the Collateral or any Obligor, (iv) the death or bankruptcy of any Obligor, (v) any default by Tenant under the Lease or any Security Document, (vi) any compromise, settlement, release, discharge, termination, waiver or extension of time for payment performance or observance of, any of the Lease Obligations, (vii) the manner of application of any payments, proceeds of Collateral or other sums to the Lease Obligations as the Landlord may elect, (viii) any exercise or non-exercise of any right, remedy, power or privilege of the Landlord with respect to the Lease Obligations, any Collateral or any Obligor, or (ix) any waiver, release, failure, omission, delay or lack of diligence on the part of Landlord to enforce, assert or exercise any such right, power, privilege or remedy; (f) agrees that it shall not be necessary for the Landlord to give the undersigned notice of, or obtain consent or approval of the undersigned, for any of the foregoing; and (g) agrees that, until all Lease Obligations of Tenant under the Lease shall have been performed, satisfied and discharged in full, the undersigned shall have no right of subrogation and hereby waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord with respect to the Lease; provided, however, it is agreed that the Guarantor's obligation to make payments with respect to Lease Obligations shall not exceed 62.50% (the "Guarantor Percent") of the total Lease Obligation, which Guarantor Percent when added to the Guarantor Percentages of other owners of the Tenant will equal 125%; provided, however, if the Guarantor is the sole guarantor of the Tenant's obligations, the Guarantor percent shall be 100%.

Executed as of the 2̲6̲7̲ḥ day of ̲S̲E̲P̲T̲E̲M̲B̲E̲R̲̲ , 2016.

WITNESS:

_____
SIGNATURE

_____
SIGNATURE

PRINT NAME: ̲W̲i̲l̲l̲i̲a̲m̲ ̲R̲.̲ ̲S̲t̲r̲o̲n̲g̲

PRINT NAME: DR. JASON LOCKETTE

STATE OF ALABAMA    )
COUNTY OF MADISON    )

## ASSIGNMENT OF TENANT LEASES

**FOR VALUE RECEIVED**, the undersigned, **MADISON MEDICAL I, LLC**, an Alabama limited liability company, (**"Assignor"**) does hereby sell, convey, transfer and assign to **CPI/AHP HUNTSVILLE MADISON MOB OWNER, L.L.C.**, a Delaware limited liability company (with legal representatives, successors and assigns, **"Assignee"**), all of the right, title and interest of the "lessor" or "landlord" in, to and under all Tenant Leases, hereinafter defined, with respect to that certain real property lying and being in Madison County, Alabama, as more particularly described on **Exhibit "A"**, attached hereto and incorporated herein by reference (the **"Property"**). This assignment shall include the leases described on **Exhibit "B"**, attached hereto and incorporated herein by reference, hereinafter called the "Scheduled Leases" and all other (if any) leases or undertakings to lease, or other agreements for the use, occupancy or possession of all or any part of the Property, whether oral or written and whether now existing or hereafter made, which, together with the Scheduled Leases, are collectively called the **"Tenant Leases."**

Assignee, by accepting delivery hereof, hereby assumes and agrees to perform all of the duties and obligations of the "lessor" or "landlord" under the Scheduled Leases arising from and after the date hereof.

Assignor shall, and does hereby, indemnify, defend and forever hold Assignee harmless from, against and in respect of any and all liabilities, damages, losses, costs and expenses (including attorneys' fees and disbursements) suffered, incurred or sustained by Assignee as a result of or by reason of the failure of any of the duties and obligations of the "lessor" or "landlord" under any of the Scheduled Leases arising prior to the date hereof to have been fully and completely performed.

Assignee shall, and does hereby, indemnify, defend and forever hold Assignor harmless from, against and in respect of any and all liabilities, damages, losses, costs and expenses (including attorneys' fees and disbursements) suffered, incurred or sustained by Assignor as a result of or by reason of the failure of any of the duties and obligations of the "lessor" or "landlord" under any of the Scheduled Leases arising on or after the date hereof to have been fully and completely performed.

**IN WITNESS WHEREOF**, Assignor and Assignee, acting by and through their authorized representatives, have executed and sealed this assignment, this 17th day of July, 2019.

[SIGNATURE PAGE TO ASSIGNMENT
TENANT LEASES]

{H0474057.1}

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this *17th*
day of July, 2019.

ASSIGNOR:

**MADISON MEDICAL I, LLC,**
an Alabama limited liability company

By: TRIAD PROPERTIES HOLDINGS, LLC, an
Alabama limited liability company, its Manager

By: _____
Name: _____
Title: Manager

ASSIGNEE:

**CPI/AHP HUNTSVILLE MADISON MOB
OWNER, L.L.C.,** a Delaware limited liability
company

By:     CPI/AHP MOB I, L.L.C., a Delaware limited
liability company, its sole member

    By:     AHP Venture I, LLC,
    a Delaware limited liability company, its
    operating member

    By: _____
    Name: _____
    Title: _____

{H0474057.1}

STATE OF ALABAMA      )

COUNTY OF MADISON   )

I, the undersigned Notary Public, in and for said County in said State, hereby certify that _William R. Stroud_, whose name as Manager of Triad Properties Holdings, LLC, as Manager of MADISON MEDICAL I, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, as such Manager and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal this the 12ᵗʰ day of July, 2019.

[NOTARIAL SEAL]

_Allie Tucker_
Notary Public
My Commission Expires: 9/13/21


STATE OF ALABAMA      )

COUNTY OF MADISON   )

I, the undersigned Notary Public, in and for said County in said State, hereby certify that _____, whose name as _____ of AHP Venture I, LLC, as the Operating Member of CPI/AHP MOB I, L.L.C., as the Sole Member of CPI/AHP HUNTSVILLE MADISON MOB OWNER, L.L.C., a Delaware limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said limited liability companies.

Given under my hand and official seal this the ___ day of July, 2019.

[NOTARIAL SEAL]

_____
Notary Public
My Commission Expires: _____

{H0474057.1}

[SIGNATURE PAGE TO ASSIGNMENT
TENANT LEASES]

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this *17 th*
day of July, 2019.

ASSIGNOR:

**MADISON MEDICAL I, LLC,**
an Alabama limited liability company

By: TRIAD PROPERTIES HOLDINGS, LLC, an
Alabama limited liability company, its Manager

By: _____

Name: _____

Title: Manager

ASSIGNEE:

**CPI/AHP HUNTSVILLE MADISON MOB
OWNER, L.L.C.,** a Delaware limited liability
company

By:    CPI/AHP MOB I, L.L.C., a Delaware limited
liability company, its sole member

By:    AHP Venture I, LLC,
a Delaware limited liability company, its
operating member

By: _____

Name: Jacob Robbins

Title:  Authorized Signatory

{H0474057.1}

**STATE OF ALABAMA**     )

**COUNTY OF MADISON**   )

     I, the undersigned Notary Public, in and for said County in said State, hereby certify that _____, whose name as Manager of Triad Properties Holdings, LLC, as Manager of MADISON MEDICAL I, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, as such Manager and with full authority, executed the same voluntarily for and as the act of said limited liability company.

     Given under my hand and official seal this the ___ day of July, 2019.

[NOTARIAL SEAL]

                        _____
                        Notary Public
                        My Commission Expires: _____


**COMMONWEALTH OF VIRGINIA**     )

**CITY OF CHARLOTTESVILLE**     )

     I, the undersigned Notary Public, in and for said County in said State, hereby certify that Jacob Robbins, Authorized Signatory of AHP Venture I, LLC, as the Operating Member of CPI/AHP MOB I, L.L.C., as the Sole Member of CPI/AHP HUNTSVILLE MADISON MOB OWNER, L.L.C., a Delaware limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited liability companies.

     Given under my hand and official seal this the 16th day of July, 2019.

[NOTARIAL SEAL]

                        _____
                        Notary Public
                        My Commission Expires: 7/31/2021

{H0474057.1}

**Exhibit "A"**
LEGAL DESCRIPTION

THAT CERTAIN PARCEL OF LAND SITUATED IN THE COUNTY OF MADISON, STATE OF ALABAMA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

LOT 4 OF THE MINOR PLAT OF MADISON CORNERS PHASE II - A RESUBDIVISION OF LOTS 1 & 3 OF MADISON CORNERS SUBDIVISION, US HIGHWAY 72 & BALCH ROAD, SECTION 29, TOWNSHIP 3 SOUTH, RANGE 2 WEST, HUNTSVILLE, MADISON COUNTY, ALABAMA, ACCORDING TO THE MAP OR PLAT OF SAID SUBDIVISION ON FILE AND OF RECORD IN THE OFFICE OF THE JUDGE OF PROBATE, MADISON COUNTY, ALABAMA, AS INSTRUMENT NO. 2011-00501370.

TOGETHER WITH THE BENEFICIAL REAL PROPERTY RIGHTS CONTAINED THAT CERTAIN DEVELOPMENT AGREEMENT BY AND BETWEEN GAYLE WANN GUY, WILLIAM FARLEY WANN, AND THE HEALTH CARE AUTHORITY OF THE CITY OF HUNTSVILLE BY DOCUMENT RECORDED AS DOCUMENT NO. 2005-00685840, PROBATE RECORDS OF MADISON COUNTY, ALABAMA.

TOGETHER WITH THE BENEFICIAL REAL PROPERTY RIGHTS, IF ANY, CONTAINED IN THAT CERTAIN DEED FROM SARAH FARLEY WANN TO THE HEALTH CARE AUTHORITY OF THE CITY OF HUNTSVILLE, RECORDED DECEMBER 18, 1997, IN OFFICIAL RECORDS BOOK 911, PAGE 31, OF THE PUBLIC RECORDS OF MADISON COUNTY, ALABAMA.

{H0474057.1}

**Exhibit "B"**

<u>SCHEDULED LEASES</u>



{H0474057.1}



{H0474057.1}

MADISON MEDICAL I
RENT ROLL
4/30/2010

| Unit | Lease Name | Area | Lease Type | Lease From | Lease To | Term (Months) | Monthly Base Rent | Annual Base Rent | Revised Rent | OPX Reimb | OPX Reimb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

FIRST FLOOR AREA | 10,505



## Exhibit B

*(see attached)*

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document       Page 56 of 74



**LEO LAW**
FIRM, LLC

April 8, 2022

<u>**VIA EMAIL AND FEDEX (OVERNIGHT):**</u>

Kevin Heard, Esq.
Heard, Ary & Dauro LLC
303 Williams Ave SW, Suite 921
Huntsville, AL 35801
kheard@heardlaw.com

Integrity Family Care North Alabama LLC
1041 Balch Road, Suite 300
Madison, AL 35758

Dr. Jason Lockette
25 Beck Street NW
Huntsville, AL 35806
Jason.lockette@integrityfamilycare.com

Mr. Jonathan Osborne
135 Heritage Lane
Madison, AL 35758
Jonathan.w.osborne@gmail.com

Dr. Jason Lockette
8 Ross Street
Huntsville, AL 35806

Mr. Jonathan Osborne
1039 Hampton Place
Birmingham, AL 35242

RE:   Tenant Default Under that Certain Lease Agreement by and between CPI/AHP Huntsville Madison MOB Owner, L.L.C., as successor-in-interest to Madison Medical I, LLC, (as "Landlord") and Integrity Family Care North Alabama, LLC (as "Tenant"), dated September 26, 2016 (the "Lease") and the Limited Lease Guaranty(ies), dated September 26, 2016, executed by Dr. Jason Lockette and Mr. Jonathan Osbourne, respectively (each, a "Guarantor", and collectively "Guarantors") in connection with that certain Lease.

Our File No: 3503-002

Dear Tenant, Dr. Lockette, Mr. Osborne, & Integrity Family Care North Alabama LLC:

I represent Landlord with respect to Tenant's default on its obligations under the Lease. As you are aware, the Lease Premises (as defined in the Lease) consists of approximately 7,589 square feet located in the Medical Office Building having an address of 1041 Balch Road, Suite 300, Madison, AL 35758 where Integrity Family Care North Alabama, LLC maintains its practice.

200 Randolph Avenue
Huntsville, AL 35801
(256) 539-6000
www.leo-law.com



Please be advised that Tenant is in default under the terms of the Lease, including but not limited to Sections 4, 6, 18, 23, and 40 for failing to pay Tenant's monthly payments of Operating Expenses, Base Rent, CAM charges, and late charges and fees (all as defined in the Lease), or a combination thereof, for the months of September 2021 through the date of this letter, which were due on or before the first calendar day of each month, respectively. As you are aware, Landlord, through its representatives and counsel, has reached out to Tenant, Dr. Lockette, and Mr. Osborne, and their respective representatives and counsel, multiple times to collect all or a portion of the past due payments, but Tenant has failed to cure its default.

As detailed in the enclosed ledger titled "Lease Ledger", dated 04/07/2022, Tenant, and its Guarantors, owe to Landlord no less than $90,954.34 for past due amounts. At this time, this amount is exclusive of applicable interest permitted to accrue under Lease Section 40.

Based on Tenant's continued default and in accordance with, among others, Lease Section 24, Landlord hereby declares and accelerates all Base Rent due under the remainder of the Lease Term. As detailed in the enclosed table titled "Integrity Family Care – Remaining Base Rent", Landlord demands payment of no less than $1,103,783.24 from Tenant and its Guarantors.

Landlord hereby elects to terminate the Lease, and demand made that Tenant, and its Guarantors, become current on its account with Landlord by making a payment to Landlord for no less than $1,194,737.58, on or before Tuesday, April 19, 2022, or surrender possession of the Premises. This demand (or "notice to quit") from Landlord is made in compliance with ALA. CODE § 35-9-1 *et seq.* Should Tenant, and its Guarantors, fail to pay the past due amount of $90,954.34 and/or the accelerated Base Rent amount of $1,103,783.24 within the next ten (10) days, Landlord shall immediately exercise any and all available remedies under the law, including but not limited to eviction (unlawful detainer) to recover possession of its premises and litigation proceedings to recover the amounts due and owing, plus applicable attorneys' fees and costs.

This letter is not a waiver or modification of any rights or options of Landlord or of any obligations of Tenant under the Lease, or of any obligations of Guarantors under the Limited Lease Guaranty(ies) or the Lease. All terms and conditions of the Lease and the Guaranty remain unchanged and in full force and effect, and Landlord reserves all rights, options, and elections it may enjoy under the Lease, the Limited Lease Guaranty(ies), and Alabama law.

Sincerely,

Kyle A. Scholl, Esq.

Case 22-80871-CRJ7   Doc 10   Filed 07/11/22   Entered 07/11/22 16:24:34   Desc Main
Document   Page 58 of 74



cc:      Landlord

Encl:     Lease Ledger
           Integrity Family Care – Remaining Base Rent

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 59 of 74

**EXHIBIT A**

**Lease Ledger**
**(see attached)**

**Lease Ledger**

Date: 04/07/2022
Property: 19117
Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)
From Date: 02/16/2017  To Date: 02/29/2028
Move In Date: 02/16/2017
Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|---|---|---|---|---|---|---|---|
| 08/01/2019 | Operating Rent - CAM (08/2019) | 300 | 4,268.61 | 0.00 | 4,268.61 | C-79760 | No |
| 08/01/2019 | Base Rent (08/2019) | 300 | 14,113.37 | 0.00 | 18,381.98 | C-79761 | No |
| 08/14/2019 | Chk# 001184 -CHECKscan Payment | | 0.00 | 18,382.18 | (0.20) | R-51349 | |
| 09/01/2019 | Operating Rent - CAM (09/2019) | 300 | 4,268.61 | 0.00 | 4,268.41 | C-80732 | No |
| 09/01/2019 | Base Rent (09/2019) | 300 | 14,113.37 | 0.00 | 18,381.78 | C-80733 | No |
| 09/26/2019 | Chk# 001187 -CHECKscan Payment - September Rent | | 0.00 | 18,382.18 | (0.40) | R-53334 | |
| 10/01/2019 | Operating Rent - CAM (10/2019) | 300 | 4,268.61 | 0.00 | 4,268.21 | C-82966 | No |
| 10/01/2019 | Base Rent (10/2019) | 300 | 14,113.37 | 0.00 | 18,381.58 | C-82967 | No |
| 10/23/2019 | Chk# 10232019ach | 300 | 0.00 | 0.01 | 18,381.57 | R-55187 | |
| 10/23/2019 | Chk# 10232019ach | | 0.00 | 0.01 | 18,381.56 | R-55188 | |
| 10/28/2019 | Chk# 001188 -CHECKscan Payment - October Rent | | 0.00 | 18,381.58 | (0.02) | R-54959 | |
| 11/01/2019 | Operating Rent - CAM (11/2019) | 300 | 4,268.61 | 0.00 | 4,268.59 | C-86194 | No |
| 11/01/2019 | Base Rent (11/2019) | 300 | 14,113.37 | 0.00 | 18,381.96 | C-86195 | No |
| 11/20/2019 | Chk# 11202019ach | | 0.00 | 18,381.98 | (0.02) | R-55954 | |
| 12/01/2019 | Operating Rent - CAM (12/2019) | 300 | 4,268.61 | 0.00 | 4,268.59 | C-88703 | No |
| 12/01/2019 | Base Rent (12/2019) | 300 | 14,113.37 | 0.00 | 18,381.96 | C-88704 | No |
| 01/01/2020 | Operating Rent - CAM (01/2020) | 300 | 4,268.61 | 0.00 | 22,650.57 | C-92002 | No |
| 01/01/2020 | Base Rent (01/2020) | 300 | 14,113.37 | 0.00 | 36,763.94 | C-92003 | No |
| 01/09/2020 | Chk# 01092020ach  Reversed by chk# 61735 Posted Duplicate payment in error | | 0.00 | 18,381.98 | 18,381.96 | R-58491 | |
| 01/13/2020 | Chk# 01132020ach | | 0.00 | 18,381.98 | (0.02) | R-58887 | |
| 02/01/2020 | Operating Rent - CAM (02/2020) | 300 | 4,268.61 | 0.00 | 4,268.59 | C-93824 | No |
| 02/01/2020 | Base Rent (02/2020) | 300 | 14,113.37 | 0.00 | 18,381.96 | C-93825 | No |
| 02/07/2020 | Chk# 02072020ach  Reversed by chk# 64564 (Re-applied receipt) | | 0.00 | 18,381.98 | (0.02) | R-60144 | |
| 02/07/2020 | Chk# 02072020ach Reapplied Receipt | | 0.00 | 18,381.98 | (18,382.00) | R-64563 | |
| 02/07/2020 | Chk# 02072020ach -Prog Gen Reverses receipt Chk# 60144 (Re-applied receipt) | | 0.00 | (18,381.98) | (0.02) | R-64564 | |
| 02/29/2020 | Integrity Family Care - toilets stopped up in suite | | 127.50 | 0.00 | 127.48 | C-98372 | No |
| 02/29/2020 | Chk# 01092020ach -Prog Gen Reverses receipt Chk# 58491 Posted Duplicate payment in error | | 0.00 | (18,381.98) | 18,509.46 | R-61735 | |
| 03/01/2020 | Operating Rent - CAM (03/2020) | 300 | 4,268.61 | 0.00 | 22,778.07 | C-96495 | No |
| 03/01/2020 | Base Rent (03/2020) | 300 | 14,395.64 | 0.00 | 37,173.71 | C-96496 | No |
| 03/03/2020 | Chk# 03032020ach  Reversed by chk# 64566 (Re-applied receipt) | | 0.00 | 18,381.96 | 18,791.75 | R-61669 | |
| 03/03/2020 | Chk# 03032020ach Reapplied Receipt | | 0.00 | 18,381.96 | 409.79 | R-64565 | |
| 03/03/2020 | Chk# 03032020ach -Prog Gen Reverses receipt Chk# 61669 (Re-applied receipt) | | 0.00 | (18,381.96) | 18,791.75 | R-64566 | |

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document      Page 61 of 74

# Lease Ledger

Date: 04/07/2022

Property: 19117

Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)

From Date: 02/16/2017  To Date: 02/29/2028

Move In Date: 02/16/2017

Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec Hold |
|---|---|---|---|---|---|---|
| 03/13/2020 | Chk# 0313 2020 bach | | 0.00 | 127.50 | 18,664.25 | R-62247 |
| 03/31/2020 | Sewer line blockage - found brown paper towels | | 127.50 | 0.00 | 18,791.75 | C-101515 No |
| 04/01/2020 | Operating Rent - CAM (04/2020) | 300 | 4,268.61 | 0.00 | 23,060.36 | C-99544 No |
| 04/01/2020 | Base Rent (04/2020) | 300 | 14,395.64 | 0.00 | 37,456.00 | C-99545 No |
| 04/24/2020 | Chk# 0424 2020 bach Remittance states March 2020 rent Reversed by ctrl# 64568 (Re-applied receipt) | | 0.00 | 18,664.25 | 18,791.75 | R-63936 |
| 04/24/2020 | Chk# 0424 2020 bach Reapplied Receipt | | 0.00 | 18,664.25 | 127.50 | R-64567 |
| 04/24/2020 | Chk# 0424 2020 bach :Prog Gen Reverses receipt Ctrl# 63936 (Re-applied receipt) | | 0.00 | (18,664.25) | 18,791.75 | R-64568 |
| 04/28/2020 | Chk# 0428 2020 bach | | 0.00 | 127.50 | 18,664.25 | R-64327 |
| 04/30/2020 | Chk# 0430 2020 bach | | 0.00 | 18,664.25 | 0.00 | R-64569 |
| 05/01/2020 | Operating Rent - CAM (05/2020) | 300 | 4,268.61 | 0.00 | 4,268.61 | C-102798 No |
| 05/01/2020 | Base Rent (05/2020) | 300 | 14,395.64 | 0.00 | 18,664.25 | C-102799 No |
| 05/08/2020 | Chk# 0508 2020 bach | | 0.00 | 18,664.25 | 0.00 | R-64777 |
| 06/01/2020 | Operating Rent - CAM (06/2020) | 300 | 4,268.61 | 0.00 | 4,268.61 | C-105443 No |
| 06/01/2020 | Base Rent (06/2020) | 300 | 14,395.64 | 0.00 | 18,664.25 | C-105444 No |
| 06/03/2020 | 2019 CAM Reconciliation | | 1,901.66 | 0.00 | 20,565.91 | C-107205 No |
| 06/12/2020 | Chk# 0612 2020 bach | | 0.00 | 18,664.25 | 1,901.66 | R-66940 |
| 06/30/2020 | INtegrity Family Care - Unclog restrooms within suite | | 190.50 | 0.00 | 2,092.16 | C-109711 No |
| 07/01/2020 | January - June tax estimate payment charges | | 12,019.91 | 0.00 | 14,112.07 | C-106803 No |
| 07/01/2020 | January - June tax estimate payment charges | | (12,019.91) | 0.00 | 2,092.16 | C-106804 No |
| 07/01/2020 | Bring January-June CAM rates to 2020 estimates | | 5,514.92 | 0.00 | 7,607.08 | C-106822 No |
| 07/01/2020 | Operating Rent - CAM (07/2020) | 300 | 3,184.44 | 0.00 | 10,791.52 | C-108301 No |
| 07/01/2020 | Operating Rent - Tax (07/2020) | 300 | 2,003.32 | 0.00 | 12,794.84 | C-108302 No |
| 07/01/2020 | Base Rent (07/2020) | 300 | 14,395.64 | 0.00 | 27,190.48 | C-108303 No |
| 07/07/2020 | Chk# 0707 2020 bach | | 0.00 | 25,098.32 | 2,092.16 | R-68411 |
| 07/31/2020 | Integrity Family Care - Undlogged sewer - found paper towels | | 127.50 | 0.00 | 2,219.66 | C-112441 No |
| 08/01/2020 | Operating Rent - CAM (08/2020) | 300 | 3,184.44 | 0.00 | 5,404.10 | C-110824 No |
| 08/01/2020 | Operating Rent - Tax (08/2020) | 300 | 2,003.32 | 0.00 | 7,407.42 | C-110825 No |
| 08/01/2020 | Base Rent (08/2020) | 300 | 14,395.64 | 0.00 | 21,803.06 | C-110826 No |
| 08/07/2020 | Chk# 0807 2020 bach | | 0.00 | 19,583.40 | 2,219.66 | R-70075 |
| 08/14/2020 | Chk# 0814 2020 bach | | 0.00 | 127.50 | 2,092.16 | R-70274 |
| 09/01/2020 | Operating Rent - CAM (09/2020) | 300 | 3,184.44 | 0.00 | 5,276.60 | C-114144 No |
| 09/01/2020 | Operating Rent - Tax (09/2020) | 300 | 2,003.32 | 0.00 | 7,279.92 | C-114145 No |
| 09/01/2020 | Base Rent (09/2020) | 300 | 14,395.64 | 0.00 | 21,675.56 | C-114146 No |
| 09/04/2020 | Chk# 0904 2020 bach | | 0.00 | 19,583.40 | 2,092.16 | R-71290 |

# Lease Ledger

Date: 04/07/2022
Property: 19117
Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)
From Date: 02/16/2017 To Date: 02/29/2028
Move In Date: 02/16/2017
Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec Hold |
|---|---|---|---|---|---|---|
| 09/30/2020 | Integrity Family Care - Unclogged drain stopped up with excess toilet paper | | 127.50 | 0.00 | 2,219.66 | C-117598 No |
| 10/01/2020 | Operating Rent - CAM (10/2020) | 300 | 3,184.44 | 0.00 | 5,404.10 | C-116124 No |
| 10/01/2020 | Operating Rent - Tax (10/2020) | 300 | 2,003.32 | 0.00 | 7,407.42 | C-116125 No |
| 10/01/2020 | Base Rent (10/2020) | 300 | 14,395.64 | 0.00 | 21,803.06 | C-116126 No |
| 10/07/2020 | Chk# 10072020ach | | 0.00 | 127.50 | 21,675.56 | R-73157 |
| 10/13/2020 | Chk# 10132020ach | | 0.00 | 19,583.40 | 2,092.16 | R-73159 |
| 10/15/2020 | Chk# 10152020ach | | 0.00 | 2,092.16 | 0.00 | R-73452 |
| 11/01/2020 | Operating Rent - CAM (11/2020) | 300 | 3,184.44 | 0.00 | 3,184.44 | C-118779 No |
| 11/01/2020 | Operating Rent - Tax (11/2020) | 300 | 2,003.32 | 0.00 | 5,187.76 | C-118780 No |
| 11/01/2020 | Base Rent (11/2020) | 300 | 14,395.64 | 0.00 | 19,583.40 | C-118781 No |
| 11/13/2020 | Chk# 11132020ach | | 0.00 | 19,583.40 | 0.00 | R-74841 |
| 12/01/2020 | Operating Rent - CAM (12/2020) | 300 | 3,184.44 | 0.00 | 3,184.44 | C-121114 No |
| 12/01/2020 | Operating Rent - Tax (12/2020) | 300 | 2,003.32 | 0.00 | 5,187.76 | C-121115 No |
| 12/01/2020 | Base Rent (12/2020) | 300 | 14,395.64 | 0.00 | 19,583.40 | C-121116 No |
| 12/08/2020 | Chk# 12082020ach | | 0.00 | 19,583.40 | 0.00 | R-76237 |
| 01/01/2021 | Operating Rent - CAM (01/2021) | 300 | 3,184.44 | 0.00 | 3,184.44 | C-124802 No |
| 01/01/2021 | Operating Rent - Tax (01/2021) | 300 | 2,003.32 | 0.00 | 5,187.76 | C-124803 No |
| 01/01/2021 | Base Rent (01/2021) | 300 | 14,395.64 | 0.00 | 19,583.40 | C-124804 No |
| 01/13/2021 | Chk# 01132021ach | | 0.00 | 19,583.40 | 0.00 | R-78035 |
| 02/01/2021 | Operating Rent - CAM (02/2021) | 300 | 3,184.44 | 0.00 | 3,184.44 | C-126702 No |
| 02/01/2021 | Operating Rent - Tax (02/2021) | 300 | 2,003.32 | 0.00 | 5,187.76 | C-126703 No |
| 02/01/2021 | Base Rent (02/2021) | 300 | 14,395.64 | 0.00 | 19,583.40 | C-126704 No |
| 02/10/2021 | Chk# 02102021ach | | 0.00 | 19,583.40 | 0.00 | R-79502 |
| 03/01/2021 | Operating Rent - CAM (03/2021) | 300 | 3,184.44 | 0.00 | 3,184.44 | C-130528 No |
| 03/01/2021 | Operating Rent - Tax (03/2021) | 300 | 2,003.32 | 0.00 | 5,187.76 | C-130529 No |
| 03/01/2021 | Base Rent (03/2021) | 300 | 14,683.55 | 0.00 | 19,871.31 | C-130530 No |
| 03/01/2021 | CAM Adjustments - January to March 2021 (1,913.67/month) | | 5,741.01 | 0.00 | 25,612.32 | C-131725 No |
| 03/17/2021 | Chk# 03172021ach | | 0.00 | 25,612.32 | 0.00 | R-81722 |
| 03/23/2021 | Actual Operating Rent - CAM (01/2020 - 12/2020) | | (2,641.40) | 0.00 | (2,641.40) | C-135213 No |
| 03/31/2021 | Integrity Family Care, Suite 300 - Unclogged break room kitchen sink | | 142.50 | 0.00 | (2,498.90) | C-135619 No |
| 03/31/2021 | Integrity, Suite 300 - Unclogged kitchen sink drain | | 142.50 | 0.00 | (2,356.40) | C-135620 No |
| 04/01/2021 | Remove Jan 2021 Tax Charges (already included in CAM estimate) | | (2,003.32) | 0.00 | (4,359.72) | C-132575 No |

# Lease Ledger

Date: 04/07/2022
Property: 19117
Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)
From Date: 02/16/2017 To Date: 02/29/2028
Move In Date: 02/16/2017
Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec Hold |
|------|-------------|------|--------|---------|---------|--------------|
| 04/01/2021 | Remove Feb 2021 Tax Charges (already included in CAM estimate) | | (2,003.32) | 0.00 | (6,363.04) | C-132576 No |
| 04/01/2021 | Remove March 2021 Tax Charges (already included in CAM estimate) | | (2,003.32) | 0.00 | (8,366.36) | C-132577 No |
| 04/01/2021 | Operating Rent - CAM (04/2021) | 300 | 5,098.11 | 0.00 | (3,268.25) | C-133694 No |
| 04/01/2021 | Base Rent (04/2021) | 300 | 14,683.55 | 0.00 | 11,415.30 | C-133695 No |
| 04/12/2021 | Chk# 0412 2021 ach | | 0.00 | 14,056.70 | (2,641.40) | R-83211 |
| 05/01/2021 | Operating Rent - CAM (05/2021) | 300 | 5,098.11 | 0.00 | 2,456.71 | C-136805 No |
| 05/01/2021 | Base Rent (05/2021) | 300 | 14,683.55 | 0.00 | 17,140.26 | C-136806 No |
| 05/19/2021 | Chk# 0519 2021 ach | | 0.00 | 17,140.26 | 0.00 | R-85125 |
| 06/01/2021 | Operating Rent - CAM (06/2021) | 300 | 5,098.11 | 0.00 | 5,098.11 | C-139698 No |
| 06/01/2021 | Base Rent (06/2021) | 300 | 14,683.55 | 0.00 | 19,781.66 | C-139699 No |
| 06/08/2021 | Chk# 0608 2021 ach | | 0.00 | 19,781.66 | 0.00 | R-86514 |
| 07/01/2021 | Operating Rent - CAM (07/2021) | 300 | 5,098.11 | 0.00 | 5,098.11 | C-142567 No |
| 07/01/2021 | Base Rent (07/2021) | 300 | 14,683.55 | 0.00 | 19,781.66 | C-142568 No |
| 07/15/2021 | Chk# 0715 2021 ach | | 0.00 | 19,781.66 | 0.00 | R-88507 |
| 08/01/2021 | Operating Rent - CAM (08/2021) | 300 | 5,098.11 | 0.00 | 5,098.11 | C-145389 No |
| 08/01/2021 | Base Rent (08/2021) | 300 | 14,683.55 | 0.00 | 19,781.66 | C-145390 No |
| 08/20/2021 | Chk# 0820 2021 ach | | 0.00 | 19,781.66 | 0.00 | R-90747 |
| 09/01/2021 | Operating Rent - CAM (09/2021) | 300 | 5,098.11 | 0.00 | 5,098.11 | C-148792 No |
| 09/01/2021 | Base Rent (09/2021) | 300 | 14,683.55 | 0.00 | 19,781.66 | C-148793 No |
| 09/30/2021 | Integrity Family Care, Suite 300 Unclogged Sewer | | 356.25 | 0.00 | 20,137.91 | C-153541 No |
| 10/01/2021 | Operating Rent - CAM (10/2021) | 300 | 5,098.11 | 0.00 | 25,236.02 | C-151870 No |
| 10/01/2021 | Base Rent (10/2021) | 300 | 14,683.55 | 0.00 | 39,919.57 | C-151871 No |
| 10/25/2021 | Chk# 1025 2021 ach September 2021 rent | | 0.00 | 19,781.66 | 20,137.91 | R-94531 |
| 10/31/2021 | Integrity Family Care, Suite 300 - Toilet repairs | | 236.73 | 0.00 | 20,374.64 | C-156845 No |
| 11/01/2021 | Operating Rent - CAM (11/2021) | 300 | 5,098.11 | 0.00 | 25,472.75 | C-155232 No |
| 11/01/2021 | Base Rent (11/2021) | 300 | 14,683.55 | 0.00 | 40,156.30 | C-155233 No |
| 11/30/2021 | Integrity Family Care, Suite 300 - cleared sewer removing paper towels, etc | | 251.65 | 0.00 | 40,407.95 | C-161415 No |
| 11/30/2021 | Integrity Family Care, Suite 300 Cleared sewer in women's rr | | 204.15 | 0.00 | 40,612.10 | C-161416 No |
| 11/30/2021 | Integrity Family Care, Suite 300 Cleared Sewer and reset toilet | | 299.15 | 0.00 | 40,911.25 | C-161417 No |
| 11/30/2021 | Integrity Family Care, Suite 300 - Cleaned out wipes and rubber gloves from sewer | | 608.65 | 0.00 | 41,519.90 | C-161418 No |
| 11/30/2021 | Integrity Family Care, Suite 300 - Unclogged sewer and reset toilet | | 103.84 | 0.00 | 41,623.74 | C-161419 No |

# Lease Ledger

Date: 04/07/2022
Property: 19117
Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)
From Date: 02/16/2017  To Date: 02/29/2028
Move In Date: 02/16/2017
Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec Hold |
|------|-------------|------|--------|---------|---------|--------------|
| 12/01/2021 | Operating Rent - CAM (12/2021) | 300 | 5,098.11 | 0.00 | 46,721.85 | C-159320 No |
| 12/01/2021 | Base Rent (12/2021) | 300 | 14,683.55 | 0.00 | 61,405.40 | C-159321 No |
| 12/17/2021 | Chk# 990052 October/November 2021 rent | | 0.00 | 40,156.30 | 21,249.10 | R-98297 |
| 01/01/2022 | Operating Rent - CAM (01/2022) | 300 | 5,098.11 | 0.00 | 26,347.21 | C-164412 No |
| 01/01/2022 | Base Rent (01/2022) | 300 | 14,683.55 | 0.00 | 41,030.76 | C-164413 No |
| 01/11/2022 | Chk# 990066 | | 0.00 | 0.00 | 36,085.34 | R-100018 |
| 01/18/2022 | Chk# 990071 1/4 rent and CAM | | 0.00 | 4,945.42 | 31,139.92 | R-100259 |
| 01/24/2022 | Chk# 990082 | | 0.00 | 4,945.42 | 26,194.51 | R-100616 |
| 01/31/2022 | Integrity Family Care, Suite 300 - Unclogged Sewer | | 204.06 | 0.00 | 26,398.57 | C-169525 No |
| 01/31/2022 | Integrity Family Care, Suite 300 - Replaced stop on hand sink | | 155.21 | 0.00 | 26,553.78 | C-169526 No |
| 01/31/2022 | Integrity Family Care, Suite 300 - Removed Paper towels from sewer. Ran camera and found no issues with the sewer | | 561.15 | 0.00 | 27,114.93 | C-169527 No |
| 01/31/2022 | Integrity Family Care, Suite 300 - Unclogged sewer | | 427.50 | 0.00 | 27,542.43 | C-169528 No |
| 02/01/2022 | Operating Rent - CAM (02/2022) | 300 | 5,098.11 | 0.00 | 32,640.54 | C-168550 No |
| 02/01/2022 | Base Rent (02/2022) | 300 | 14,683.55 | 0.00 | 47,324.09 | C-168551 No |
| 02/15/2022 | Chk# 990091 January 2022 | | 0.00 | 4,945.41 | 42,378.68 | R-101564 |
| 02/17/2022 | Chk# 990098 | | 0.00 | 4,945.42 | 37,433.26 | R-102281 |
| 02/28/2022 | Integrity Family Care, Suite 300 - Unclogged Sewer - Found feminine products | | 0.00 | 4,945.42 | 32,487.84 | R-102326 |
| 02/28/2022 | Integrity Family Care, Suite 300 - Sewer clogged with feminine products | | 365.38 | 0.00 | 32,853.22 | C-175721 No |
| 03/01/2022 | Actual Operating Rent - CAM (01/2021 - 12/2021) | | 151.63 | 0.00 | 33,004.85 | C-175722 No |
| 03/01/2022 | Adjust January 2021 CAM to correct amount | | (893.52) | 0.00 | 32,111.33 | C-170883 No |
| 03/01/2022 | Adjust February 2021 CAM to correct amount | | 77.60 | 0.00 | 32,188.93 | C-172673 No |
| 03/01/2022 | Operating Rent - CAM (03/2022) | 300 | 77.60 | 0.00 | 32,266.53 | C-172690 No |
| 03/01/2022 | Base Rent (03/2022) | 300 | 5,175.71 | 0.00 | 37,442.24 | C-174563 No |
| 03/31/2022 | Integrity Family Care, Suite 300 Water reported in rr but no leak found | | 14,977.22 | 0.00 | 52,419.46 | C-174564 No |
| 03/31/2022 | September 2021 Late Fees | | 95.00 | 0.00 | 52,514.46 | C-179938 No |
| 03/31/2022 | October 2021 Late Fees | | 989.08 | 0.00 | 53,503.54 | C-179988 No |
| 03/31/2022 | November 2021 Late Fees | | 1,978.17 | 0.00 | 55,481.71 | C-179989 No |
| 03/31/2022 | December 2021 Late Fees | | 1,995.98 | 0.00 | 57,477.69 | C-179990 No |
| 03/31/2022 | January 2022 Late Fees | | 2,996.90 | 0.00 | 60,474.59 | C-179991 No |
| 03/31/2022 | February 2022 Late Fees | | 2,051.54 | 0.00 | 62,526.13 | C-179992 No |
| 03/31/2022 | March 2022 Late Fees | | 2,051.54 | 0.00 | 64,577.67 | C-179993 No |
| 03/31/2022 | | | 2,595.12 | 0.00 | 67,172.79 | C-179994 No |

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document        Page 65 of 74

**Lease Ledger**

Date: 04/07/2022
Property: 19117
Tenant: t0001349 Integrity Family Care North Alabama, LLC (IFC)
From Date: 02/16/2017 To Date: 02/29/2028
Move In Date: 02/16/2017
Unit(S): 300

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 04/01/2022 | Operating Rent - CAM (04/2022) | 300 | 5,175.71 | 0.00 | 72,348.50 | C-177936 | No |
| 04/01/2022 | Base Rent (04/2022) | 300 | 14,977.22 | 0.00 | 87,325.72 | C-177937 | No |
| 04/06/2022 | April 2022 Late Fees | | 3,628.62 | 0.00 | 90,954.34 | C-180113 | No |

**EXHIBIT B**

**Integrity Family Care – Remaining Base Rent**
**(see attached)**

**Madison MOB**
**Integrity Family Care - Remaining Base Rent**

| | Base Rent | Total |
|---|---|---|
| May-22 | $14,977.22 | $1,103,783.24 |
| Jun-22 | $14,977.22 | |
| Jul-22 | $14,977.22 | |
| Aug-22 | $14,977.22 | |
| Sep-22 | $14,977.22 | |
| Oct-22 | $14,977.22 | |
| Nov-22 | $14,977.22 | |
| Dec-22 | $14,977.22 | |
| Jan-23 | $14,977.22 | |
| Feb-23 | $14,977.22 | |
| Mar-23 | $15,276.77 | |
| Apr-23 | $15,276.77 | |
| May-23 | $15,276.77 | |
| Jun-23 | $15,276.77 | |
| Jul-23 | $15,276.77 | |
| Aug-23 | $15,276.77 | |
| Sep-23 | $15,276.77 | |
| Oct-23 | $15,276.77 | |
| Nov-23 | $15,276.77 | |
| Dec-23 | $15,276.77 | |
| Jan-24 | $15,276.77 | |
| Feb-24 | $15,276.77 | |
| Mar-24 | $15,582.30 | |
| Apr-24 | $15,582.30 | |
| May-24 | $15,582.30 | |
| Jun-24 | $15,582.30 | |
| Jul-24 | $15,582.30 | |
| Aug-24 | $15,582.30 | |
| Sep-24 | $15,582.30 | |
| Oct-24 | $15,582.30 | |
| Nov-24 | $15,582.30 | |
| Dec-24 | $15,582.30 | |
| Jan-25 | $15,582.30 | |
| Feb-25 | $15,582.30 | |
| Mar-25 | $15,893.95 | |
| Apr-25 | $15,893.95 | |
| May-25 | $15,893.95 | |
| Jun-25 | $15,893.95 | |
| Jul-25 | $15,893.95 | |
| Aug-25 | $15,893.95 | |
| Sep-25 | $15,893.95 | |
| Oct-25 | $15,893.95 | |
| Nov-25 | $15,893.95 | |

| | |
|---|---|
| Dec-25 | $15,893.95 |
| Jan-26 | $15,893.95 |
| Feb-26 | $15,893.95 |
| Mar-26 | $16,211.83 |
| Apr-26 | $16,211.83 |
| May-26 | $16,211.83 |
| Jun-26 | $16,211.83 |
| Jul-26 | $16,211.83 |
| Aug-26 | $16,211.83 |
| Sep-26 | $16,211.83 |
| Oct-26 | $16,211.83 |
| Nov-26 | $16,211.83 |
| Dec-26 | $16,211.83 |
| Jan-27 | $16,211.83 |
| Feb-27 | $16,211.83 |
| Mar-27 | $16,536.07 |
| Apr-27 | $16,536.07 |
| May-27 | $16,536.07 |
| Jun-27 | $16,536.07 |
| Jul-27 | $16,536.07 |
| Aug-27 | $16,536.07 |
| Sep-27 | $16,536.07 |
| Oct-27 | $16,536.07 |
| Nov-27 | $16,536.07 |
| Dec-27 | $16,536.07 |
| Jan-28 | $16,536.07 |
| Feb-28 | $16,536.07 |



May 05, 2022

Dear Customer,

The following is the proof-of-delivery for tracking number: 776533459388

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Receptionist/Front Desk |
| Signed for by: | C.BLAKE | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | MADISON, AL, |
| | | Delivery date: | Apr 11, 2022 08:17 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 776533459388 | Ship Date: | Apr 8, 2022 |
| | | Weight: | 0.5 LB/0.23 KG |
| Recipient: | | Shipper: | |
| MADISON, AL, US, | | Huntsville, AL, US, | |

| | |
|---|---|
| Reference | 3503-002 |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

Thank you for choosing FedEx

## Exhibit C

*(see attached)*

Case 22-80871-CRJ7    Doc 10    Filed 07/11/22    Entered 07/11/22 16:24:34    Desc Main
Document    Page 71 of 74



**AlaFile E-Notice**

47-DV-2022-900871.00

To: SCHOLL KYLE ANTHONY
kscholl@leo-law.com

# NOTICE OF ELECTRONIC FILING

IN THE DISTRICT COURT OF MADISON COUNTY, ALABAMA

CPI/AHP HUNTSVILLE MADISON MOB OWNER LLC V. INTEGRITY FAMILY CARE NORT
47-DV-2022-900871.00

The following answer was FILED on 5/24/2022 9:43:17 AM

Notice Date:     5/24/2022 9:43:17 AM

DEBRA KIZER
CIRCUIT COURT CLERK
MADISON COUNTY, ALABAMA
MADISON COUNTY, ALABAMA
100 NORTHSIDE SQUARE
HUNTSVILLE, AL, 35801

256-532-3622

ELECTRONICALLY FILED
5/24/2022 9:43 AM
47-DV-2022-900871.00
DISTRICT COURT OF
MADISON COUNTY, ALABAMA
DEBRA KIZER, CLERK

## IN THE DISTRICT COURT OF MADISON COUNTY, ALABAMA

| | |
|---|---|
| CPI/AHP HUNTSVILLE MADISON MOB OWNER, LLC, )<br><br>Plaintiff, )<br>v. )<br><br>INTEGRITY FAMILY CARE OF NORTH ALABAMA, LLC, )<br><br>Defendant. ) | Case No.: 47-DV-2022-900871 |

### SUGGESTION OF BANKRUPTCY

NOTICE IS HEREBY given that Integrity Family Care of North Alabama, LLC, Defendant in the above-styled action, filed for relief under Chapter 7 of Title 11 of the United States Code on May 23, 2022. This case is pending in the United States Bankruptcy Court for the Northern District of Alabama, Case No. 22-80871-CRJ7. Any further action in this matter against Integrity Family Care of North Alabama, LLC is hereby stayed and is subject to the provisions of 11 U.S.C. § 362.

Respectfully submitted this the 24th day of May, 2022.

/s/ Kevin D. Heard
Kevin D. Heard
Attorney for Debtor

Of Counsel:
HEARD, ARY & DAURO, LLC
303 Williams Avenue
Park Plaza, Suite 921
Huntsville, Alabama 35801
Tel: (256) 535-0817
Fax: (256) 535-0818
kheard@heardlaw.com

DOCUMENT 10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this the 24th day of May, 2022, I have served a true and correct copy of the foregoing document upon all counsel of record and the following, via electronic notice and/or U.S. Mail, postage prepaid.

Kyle A. Scholl
Brian J. Richardson
*Attorneys for Plaintiff*
LEO LAW FIRM
200 Randolph Avenue
Huntsville, AL 35801
Tel: (256) 539-6000
kscholl@leo-law.com
brichardson@leo-law.com

                                             */s/ Kevin D. Heard*
                                             Kevin D. Heard